HOMEWOOD FISHING CLUB, Plaintiff-Appellee, v. ARCHER DANIELS MIDLAND COMPANY, Defendant-Appellant.

Fourth District No. 4—92—0092

Opinion filed December 28, 1992.—Rehearing denied January 27, 1993.

Wayne L. Bickes and Kurt B. Bickes, both of Bickes & Bickes, Ltd., and A. James Shafter and James E. Peckert, both of Kehart, Shafter, Hughes & Webber, P.C., both of Decatur, for appellant.

Harlan Heller, of Heller, Holmes & Associates, P.C., of Mattoon, and Kenneth Baughman, of Monticello, for appellee.

JUSTICE LUND delivered the opinion of the court:

Defendant Archer Daniels Midland Company (ADM) appeals the denial of its post-trial motion following a jury verdict in favor of plaintiff, the Homewood Fishing Club (Homewood), for $3,750,000 in compensatory and punitive damages, based upon acts or omissions of ADM which allegedly caused pollution of a small shallow lake owned by Homewood. We reverse.

ADM's west plant is located in Decatur on a 25-acre site. That site is part of a 380-acre watershed, to the south of which lies approximately 14 acres of land owned by Homewood. Seventeen residences owned by Homewood's members are situated on that land, along with the Homewood lake. The lake is adjacent to Lake Decatur, with a spillway located between the two lakes. All storm water runoff from the 380 acres goes to a small unnamed tributary, which in turn feeds into the lake. The lake, originally some five acres in size, was constructed in 1914. In the mid-1960's, Homewood residents dammed up

the northern portion of the lake and filled it in, reducing the lake's size to under three acres.

ADM's west plant is a grain processing and storage facility operated as a soybean extraction plant, a corn germ extraction plant, and a vegetable oil refinery. ADM first began operations there in 1961. The pollution alleged to have been caused to the lake by ADM stems from storm water runoff from the west plant through a 24-inch tile leading to an outlet at the head of the Homewood tributary. That tributary feeds the lake, flowing through the dammed-up northern portion to the now-existing portion of the lake.

Homewood originally filed suit against ADM on July 23, 1984, essentially making the same allegations of pollution to the lake as are made in the instant case. However, Homewood sought to bring that action in a representative capacity on behalf of its members. Certain counts of its complaint were dismissed by the trial court. Homewood voluntarily dismissed the remaining counts and appealed. This court affirmed the trial court's dismissal in a Rule 23 order (*Homewood Fishing Club v. Archer Daniels Midland* (1988), 176 Ill. App. 3d 1176 (unpublished order under Supreme Court Rule 23)), holding that Homewood could not bring the action on behalf of its members. Homewood filed its complaint in the instant case on January 20, 1989. The trial court ruled that this filing related back to the date of the filing of Homewood's July 23, 1984, complaint. It also ruled that Homewood's complaint in this case alleged a temporary nuisance and, pursuant to the provisions of section 13—205 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 13—205), all claims for damages arising prior to July 23, 1979, were barred.

The final version of Homewood's complaint was in three counts. Count I alleged intentional acts or omissions on the part of ADM in creating a nuisance. In general, it alleged: (1) in 1971, ADM constructed two 200,000-gallon tanks at its west plant, one for waste-water processing and the other for collecting storm water falling on the plant site; (2) the tanks were of inadequate size to hold the natural rainfall falling on the plant grounds, resulting in (a) the collection of storm water in the tanks containing contaminated oil and milling by-products from the plant grounds, and (b) the discharge from the tanks into the Homewood tributary and ultimately into the lake; (3) the discharges were accompanied by excessive or illegal amounts of bean oil, hulls, and other organic material in sufficient quantities to seriously reduce the dissolved oxygen level in the lake, contaminate the water and the bottom of the lake with these materials, and cause the lake bottom deposits to become turbid and to contain excessive amounts of

oil and grease; (4) damage to the lake included killing of fish, filling the lake with sludge and discoloring it, creating high concentrations for biochemical oxygen demand (BOD), suspended solids, and oils, and making it unusable for recreational purposes; (5) despite knowledge of the condition, ADM failed to abate it until June 1986; and (6) ADM's acts were intentional because its agents allowed these discharges to continue after being informed as early as 1972 of the contaminated discharges, as evidenced by its agents attempting to clean or treat them, and its agents admitted the contamination to the Illinois Environmental Protection Agency (IEPA). Count I asked for compensatory damages of $5 million.

Count II alleged wilful and wanton misconduct and asked for $5 million in compensatory damages and an award for punitive damages. It alleged substantially the same acts alleged in count I and, in addition, alleged that ADM had committed one or more of the following acts which were either wilful and wanton or undertaken with a conscious disregard of, or utter indifference to, the rights of Homewood: (1) constructing inadequate holding facilities for rainwater falling on the plant, thereby utilizing the lake as a "sludge pit" for ADM's contaminated storm water, since discharge from the tanks was designed to flow into the lake; (2) advising IEPA in 1971 that it intended to completely shut off the storm water discharge from the plant to the lake, but failing to do so, and falsely advising the IEPA in 1974 that it had done so; (3) failing to abide by its agreement with the United States Environmental Protection Agency (USEPA) to prepare an engineering report dealing with the storm water discharge problem by August 1976; (4) denying that ADM had caused the lake pollution, when it knew, or had reason to know, that in fact it was the cause; and (5) failing to take action to remedy the discharge problem until sued by the State of Illinois in 1980 or fined by the Illinois Pollution Control Board (Pollution Board).

Count III alleged negligence on the part of ADM, based upon many of the acts set forth above. It also alleged that ADM's agents and employees (1) failed to construct an adequate holding tank to contain normal rainfall on its west plant; (2) failed to conduct adequate engineering studies to determine the capacity of its drainage system and to construct and maintain an adequate drainage system; (3) violated section 12 of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1991, ch. 111½, par. 1012) and rules of the Pollution Board by discharging contaminated effluent from its premises; (4) on July 28, 1979, allowed discharge contaminated with milling by-products to flow over the sides of the storm water clarifier by negligently failing to

turn off the lift station pumps which fed the tank; and (5) on June 26, 1981, negligently pumped sludge from the storm water clarifier through a leaking hose connection, allowing approximately 200 gallons of sludge to run into the storm water system, thereby causing contaminated water to be discharged into the lake. Count III asked for compensatory damages of $1 million.

Although Homewood was barred from claiming any damages for acts that occurred prior to July 23, 1979, the trial court did allow presentation of evidence at trial of pre-July 23, 1979, acts for the limited purpose of demonstrating notice to ADM of the discharges and of determining whether ADM's post-July 23, 1979, acts were intentional or wilful and wanton. The trial court instructed the jury, both orally and in the written instructions, that it could consider such evidence only for the limited purposes stated and not for the purpose of assessing damages.

The trial in this cause spanned 22 days in May and June 1991, and 41 witnesses testified either in person or by deposition. The evidence is summarized only as is necessary for an understanding of our disposition of this case.

ADM officials and employees testified concerning the nature of the west plant process, storm water collection, and drainage system. Prior to the mid-1970's, water from the plant's processing operations went to the process water clarifier, a concrete tank holding from 180,000 to 200,000 gallons. There, lightweight materials such as vegetable oil rose to the top of the water and were continuously removed by a skimming mechanism. The heavier materials settled to the bottom and were then pumped out of the clarifier to the Decatur sanitary district. The storm water clarifier was physically identical to the process water clarifier, but it received only rainwater falling on the plant grounds. That water was treated in the same manner as the process water. The purpose of the storm water clarifier was to separate liquids from solids so that water discharged through the storm sewer line would have a high percentage of solids removed. Unlike process water, the only storm water the sanitary district would take was the sludge accumulated at the bottom of the storm water clarifier and the dry weather flow (water from cleaning operations) which was pumped by two 250-gallon-per-minute pumps. The sludge was pumped out of the storm water clarifier to the process water clarifier and on to the sanitary district. All other storm water went to the Homewood tributary.

In the late 1970's, ADM changed its storm water treatment to the first flush concept. This theory holds that the first tank of storm wa-

ter is the most polluted. The Decatur sanitary district agreed to accept this first 200,000 gallons of storm water. After this concept was employed, there was no pumping of sludge from the storm water tank. Any storm water beyond that first 200,000 gallons went to the Homewood tributary.

Some expert witnesses testified as to recommendations they made to ADM in the 1970's and 1980's to build additional storm water holding facilities. Since ADM admittedly did not follow these recommendations, Homewood sought to use this evidence at the trial to show ADM's wilful and wanton misconduct on the issue of the discharges. However, it was the consensus of experts who testified that any recommendations to ADM prior to 1986 as to building such additional holding facilities was premised upon the assumption that ADM could discharge all its storm water to the sanitary district. One expert testified that from an engineering standpoint, there was no single solution to achieving pure storm water runoff other than 100% capture of the water. The evidence showed that it was not until 1986 that the sanitary district agreed to take all of ADM's storm water. Prior to that time, it was undisputed by the witnesses who testified that had ADM tried to construct storm water facilities adequate to hold all rainwater that fell on the west plant, it could have done nothing with the water once the holding facilities were full. The evidence also showed that once permission was received from the sanitary district to discharge all storm water to the district, ADM placed a 500,000-gallon storm water holding tank on the west plant property and made other improvements to increase the capacity of its storm water retention facilities. There had been no discharges to the tributary since 1986, with ADM's storm water holding capacity at approximately one million gallons by that time.

Several witnesses testified concerning the condition of the lake and events which occurred prior to July 23, 1979. James See, a former resident of Homewood, testified as to his contacts with ADM employees after oil overflowed into the lake in 1970 or 1971, killing fish, ducks, and birds. ADM sent employees to clean up the banks of the lake.

Bonnie Hudson testified that the Homewood tributary runs through her property. About 1970, it began to have an odor. In 1972, the water turned gray and had a bean odor. ADM employees dumped oxidizer in it. She saw reddish-black lumps along the edges and bottom of the creek, pulsating with long white worms. She had contacts with ADM employees in 1972 and 1973 concerning problems with pollution in the creek. After a heavy rainfall in June 1974, she saw red

worms and bean oil residue along the creek and there was a terrible smell. For several days in August 1974, the creek water was either brown and thick or gray.

Robert Patterson, secretary of Homewood, testified that Homewood records show there was a concern about the condition of the lake in 1946. The north end was a mud flat, and the lake was filling up with sediment. A contract was let in 1947 for the creation of two earthen structures at the lake, forming two separate pools. The upper pool was to serve as a sediment basin and the lower pool as the main fishing spot. There was also a concern in 1950 about unsanitary conditions at the lake due to open sewers in its watershed. An October 1961 letter from the Illinois Department of Conservation (Conservation Department) advised Homewood that the main problem in maintaining the lake as a good fishing lake was that the water was too shallow. There was a very poor fish population. A winter or summer fish kill is likely when the water is so shallow, and not much could be done to help the lake unless it could be deepened. In 1962, the north part of the lake was dammed and filled in to reduce the amount of silt to the south part of the lake. In 1963, there were continuing efforts to reduce siltation. In 1967, further advice was received from the Conservation Department to restock the lake and to remove trash, debris, and other unwanted materials from the lake.

Stan Schwartz, a resident of Homewood since 1955, testified as to the building of the dam in 1962. He stated the reason for building the dam was that the north part of the lake had filled in to the point that it was swampy and mosquito infested. The hope was to prevent that from happening to the south part of the lake. The lake was drained, allowed to dry, and then a dam was built with railroad ties and filled with dirt and broken concrete. The north end of the lake smelled bad when the bottom deposits were stirred up. In about 1963, residents added more fill to the dammed-up part of the lake, a process that continued for two or three years. When the lake was drained in 1962, there were four or five feet of silt in the south half of the lake. Schwartz described it as a black mucky mess. Neither he nor his children swam in the lake. He also stated that the Conservation Department told residents in 1961 that fish would not propagate in the lake because the oxygen content of the water was too low and the water was too shallow.

There was also evidence of discharges occurring subsequent to July 23, 1979. Bonnie Hudson testified that in June 1981 she observed the creek water was very thick, oily, and had a cloudy gray color with

a bean smell. In July 1981, she observed slime and red-worm bacteria. In August 1981, there was a cloudy brownish flow with a bean smell.

Thomas Tarvin, a former resident of Homewood, testified that on June 26, 1981, he observed a discharge coming from the ADM tile which had an unpleasant odor. Half the lake was a cloudy gray color. From time to time while he lived there from 1980 to 1989, he noticed bean oil on the lake water. In the summer the water would be a black-ish-yellow color. He also saw other pollution in the lake such as grass clippings and pop bottles that would wash down the stream to the lake after heavy rains.

Nancy Abernathy testified that on July 28, 1979, she saw meal particles throughout the lake. The fish died. There was an "atrocious" smell which lasted about a week.

Leonard Bridges, a former IEPA scientist, testified that on July 28, 1979, he investigated a fish kill at the lake. ADM had reported that its storm water clarifier had overflowed about 800,000 gallons, which went into the storm sewer carrying 10 to 12 barrels of bean oil to the tributary. He observed floating scum and bean oil on the lake, floating dead fish, and fish gasping for air. The smell was that of a bean or vegetable-type oil. Tests showed no oxygen in the water. Samples taken of the bottom deposits were black, odorous, and septic. On June 26, 1981, he went to the lake in response to a complaint and observed a brown discharge with a bean oil odor at ADM's storm water outlet to the tributary. He observed that the discharge from ADM's storm water clarifier was similar to that coming from the outlet.

The July 28, 1979, discharge was caused by a failure to turn off pumps to the storm water clarifier once it became full after a rain. About 10,000 to 15,000 gallons from the first flush water discharged to the tributary. After this, ADM put a mechanical float on top of the clarifier which would automatically kill power to the pumps. The June 26, 1981, discharge was accidentally caused when employees swept sludge from the storm water holding tank into drains that were thought to go to the process water treatment system, but in reality went to ADM's outlet to the Homewood tributary. Some 50 to 60 gallons of sludge were discharged in this manner. There was also a discharge on June 6, 1986, after a rainfall of just under seven inches. A discharge of 235,000 gallons was made to the tributary on that date from an estimated 5.3 million gallons of rain that fell on the plant during that rainfall.

ADM's west plant has 25 acres from a 380-acre watershed. It was undisputed at trial that the lake has received, and is continuing to receive, significant pollutants from sources other than ADM. This pollu-

tion comes from urban storm water runoff from many different sources in the lake's watershed and from the sewer system in that area. John Guillou, a hydraulic engineer, testified that part of the watershed is extensively sewer. Tilled land in the area would produce about three tons of sediment per acre, per year. This material flows into the lake. There would be about 100 pounds of street sediments and pollutants going into the lake each year. The lake's watershed is six times greater than the maximum recommended by the Conservation Department. Guillou further testified that a lake such as Homewood lake would require regular dredging to maintain adequate depths.

Thomas Berns, a professional engineer and an expert witness for Homewood at trial, testified that Homewood lake, like all others, undergoes an aging process whereby it will eventually fill with silt and die. He said that placing the silt dam and the fill material at the north end of the lake was counterproductive to the maintenance of the lake, because the smaller lake was now absorbing twice the pollutants and sediment that it would have without the size reduction. A small lake in Illinois should have a ratio of 10 to 20 acres of watershed to one surface acre of water. The Homewood lake has about 150 acres of watershed for each surface acre of water. The problems that may develop with a larger watershed include turbidity due to siltation, soft water, low nutrients due to frequent water exchange, dam failure, and sedimentation.

Several witnesses testified to ADM's failure to comply with IEPA and USEPA regulations regarding discharge permits, reports, and effluent limitations. This evidence was admitted by the trial court to demonstrate ADM's alleged intentional or wilful and wanton misconduct in regard to the discharges.

ADM was required to have a National Pollutant Discharge Elimination System (NPDES) permit to operate the two clarifiers. The evidence showed that at certain times during the 1970's it did not have such a permit. The permit prohibited ADM from discharging effluent that had more than four milligrams per liter (mg./1.) of BOD and more than five mg./1. of suspended solids. The evidence generally showed that ADM was unable to meet these restrictions, which one expert witness described as "stringent." Another expert witness admitted, as an example, that storm water runoff from the K mart parking lot would not meet those restrictions. Essentially, water meeting the restrictions of ADM's NPDES permit would be drinkable. Evidence as to specific discharges indicated that, in each case, the BOD and suspended solids greatly exceeded the permit restrictions.

Evidence also showed that ADM, at times, failed to file reports with the IEPA after discharges of storm water that did not meet permit restrictions and failed to file routine reports at the required times.

In an effort to show ADM's wilful and wanton misconduct, Homewood adduced evidence that ADM had failed to comply with USEPA directives in an agreement made in 1975, between the agency and ADM, to bring ADM's storm water discharges into compliance with its permit restrictions. ADM was to submit a progress report, engineering report, and complete construction by June 1977. ADM officials admitted the deadlines were not met. However, they testified as to efforts made by ADM to improve its housekeeping at the west plant and to reduce or eliminate dust and bean spillage, which in turn would improve the storm water quality.

Various experts testified to the present condition of the lake's bottom deposits and to the manner and costs of repair to the lake.

Daniel Goodwin, a professional engineer and expert witness for Homewood, testified as to his examination of the lake and soil samples taken from the lake. He stated the lake sediment had a very greasy, slimy consistency to it, as well as an "obnoxious" odor. There was no oxygen present in the sediment, as indicated by the gas bubbles rising to the surface of the water when the bottom deposits were disturbed. The organic material causing this situation could be natural, such as leaves, or could be such things as bean meal or vegetable oil. His opinion was that the lake is seriously deteriorated in terms of its ability to sustain any beneficial uses. Goodwin felt the sediment samples between his fingers and concluded that the samples contained oil. However, he could not say whether it was vegetable oil or some other type of oil. He also testified that, in his professional opinion, discharges from ADM into the tributary since July 1979 had resulted in accumulation of large quantities of unnatural, highly organic and oily materials which, even today, blanket the bottom of the lake. It would take a long time for the lake to recover from the pollution received from ADM since July 1979.

Goodwin testified that there is a great deal of sediment in the lake, much of it caused when the north part of the lake was filled in. He could not say how much sediment was in the lake in 1979, and there is no practical way to separate the sediment existing prior to 1979 from that accumulated since. Nonetheless, he recommended dredging the lake to its approximate depth when constructed in 1914.

Berns testified that the lake was in deplorable condition in 1984 when he first viewed it. The sediment was very greasy, slimy, and oily. While the original depth of the lake would have been between 12 and

16 feet, it now only averages three to five feet deep. He had reviewed ADM's discharge monitoring reports and observed that on several occasions since July 23, 1979, ADM's discharges had exceeded the limitations of its NPDES permit by several hundreds of volumes of concentrations. He gave the opinion that ADM was the source of the noxious material in the lake bed after July 1979. Berns was aware that ADM's was not the only outlet to the tributary, but he did not concern himself with other sources of pollution in the lake's watershed. He stated he had no knowledge as to how deep the sediment is today or how deep it was in 1979, nor did he have any knowledge of the condition of the lake prior to July 23, 1979. He also testified that it is possible that there were oil and grease deposits in the lake prior to 1979 and, if so, those deposits would have smelled as bad then as they do today. Those deposits would also have likely been slimy and oily in 1979. He also stated that he had not made any study on how much material was discharged by ADM since 1979, how much stayed in the lake and how much passed over the spillway to Lake Decatur, or how long it would take for the materials that stayed in the Homewood lake to biodegrade. Berns also testified there is no way to calculate precisely the amount of fats, oil, and grease in the silt at the bottom of the Homewood lake. He testified the cost to restore the lake to its 1914 condition would be $1.6 million.

Richard Helm, an expert witness testifying for ADM, stated that he had taken soil samples from the lake bottom and from the fill area at the north end of the lake. He performed a "fats, oil and grease" test and a test for petroleum hydrocarbons (petroleum-based oil). His opinion was that the majority of oil and grease present in the samples was in the form of petroleum hydrocarbons. He stated that soybean meal and oil are biodegradable and, according to IEPA standards, 25 pounds of soybean oil could be discharged into a lake such as the Homewood lake every day forever and it would continuously biodegrade, with the lake maintaining the same dissolved oxygen level. However, he admitted that he had no knowledge of the actual load discharged into the lake by ADM.

Counsel for ADM was allowed to read a memorandum to the jury from the IEPA, which indicated sludge samples from the Homewood lake had been taken in December 1980 and tested by the agency some 63 days later. Results of those tests indicated no soybean oil or other vegetable oil in the samples. The detection limit for soybean oil is five parts per million. Homewood attempted to impeach this evidence by testimony from Goodwin that the tests were not valid because the accepted time limit on testing samples is 28 days and the IEPA had

waited 63 days before testing. However, other evidence indicated the effect of the extra time would be uncertain, that it would depend on the conditions under which the samples were stored and that any reduction in detectable oils would not have been to zero.

Dennis Garceau, former ADM west plant manager, testified that during the trial he visited the lake and took some samples from the bottom deposits. The samples had a rotten smell and an oil-type smell, similar to fuel oil.

Charles Jolly, a drilling supervisor and geologist employed by a consulting engineering firm, testified that he drilled at the lake in early 1991 and took samples all the way down to the original lake bottom. He found decaying organic, smelly material right on top of the original glacial bottom. Above the organic material was fill material consisting of asphalt, concrete rubble, and other material placed there when the silt dam was built. He testified that under the law of superposition, the bottom layer is always the oldest.

John Guillou testified further as to these soil borings. In his opinion, because the fill material was on top of the organic material, the organic material was deposited prior to the added fill material. He also testified that he observed a bank of digested sewage at the northern part of the lake by the fill area. He saw sewage seeping out between the pieces of concrete fill. The odor was one of sewage, and testing of samples confirmed the material was sewage from the intestinal tracts of warm-bodied animals. Based upon the accumulation of ash he saw, Guillou stated his opinion that this sewage had been seeping into the lake for many years. He stated that what is making the lake shallow is not organic material that may have flowed or is still flowing into the lake; rather, it is the sediment or soil that has flowed into the lake from its watershed. Guillou also gave his opinion that there are three things wrong with the lake: (1) it was not properly designed because of the mammoth size of its watershed; (2) there is sewage flowing into the lake; and (3) it does not have sufficient capability of receiving oxygen to take care of the nutrients that are flowing into the lake because it is too small for its watershed. Guillou admitted that he had not investigated the discharges from ADM into the lake.

The jury returned a verdict in favor of Homewood for $800,000 in compensatory damages and $2,950,000 in punitive damages. The trial court entered judgment on the verdict. ADM's post-trial motion was denied, and this appeal followed.

ADM argues that it was entitled to a judgment notwithstanding the verdict (*n.o.v.*) as to the punitive damage award or, in the alternative, that we should grant a remittitur of this award. For the reasons

discussed below, we conclude the punitive damage award must be vacated *in toto.*

Verdicts should be directed and a judgment *n.o.v.* should be entered only where all the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

■ Punitive damages are awarded for the purpose of punishing the offender and to deter that party and others from committing similar acts of wrongdoing in the future. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 350, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012; *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 414, 563 N.E.2d 397, 401.) Punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts wilfully or with such gross negligence as to indicate a wanton disregard for the rights of others (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359), or for conduct involving some element of outrage similar to that found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others. (Restatement (Second) of Torts §908, Comment *b*, at 464-65 (1979).) Wilful and wanton misconduct is that which usually approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of that risk. (*Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 457, 501 N.E.2d 830, 839.) Because of their penal nature, punitive damages are not favored in the law, and for this reason, caution must be used to see that they are not unwisely awarded. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 203, 537 N.E.2d 267, 272; *Kelsay*, 74 Ill. 2d at 188, 384 N.E.2d at 360.) While the amount of punitive damages is a question for the jury, the initial decision of whether punitive damages may be awarded in a particular case is a matter of law for the trial judge to decide. *J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 453, 516 N.E.2d 260, 263; *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 211, 454 N.E.2d 210, 219.

In the instant case, the jury was given the following issues instruction on count II of Homewood's complaint, *i.e.*, the count requesting punitive damages:

"1. Plaintiff claimed it sustained damages and that the conduct of the defendant was wilful and wanton in one or more of the following respects:

a. Defendant maintained a storm water collection and retention tank upon its property which was inadequate to hold all of the rainfall which fell on the grounds of the ADM West Plant which conduct was undertaken deliberately with the intention to harm the plaintiff.

b. Defendant maintained a storm water collection and retention tank upon its property which was inadequate to hold all of the rainfall which fell on the grounds of the ADM West Plant which conduct was undertaken with an utter indifference to or a conscious disregard for the safety of plaintiff's property.

2. Plaintiff further claims that one or more of the foregoing was a proximate cause of plaintiff's damages.

3. Defendant denies doing any of the things claimed by plaintiff, denies defendant was wilful and wanton in doing any of the things claimed by plaintiff and denies that any claimed act or omission on defendant's part as a proximate cause of plaintiff's damage.

4. Defendant further denies that plaintiff sustained damages or sustained damage to the extent claimed."

 Insufficient evidence was introduced by Homewood at trial to support the jury's verdict under this instruction. All the experts and former IEPA employees who testified as to the alleged inadequacy of ADM's storm water system stated that, while increasing the capacity of the storm water holding tank was recommended to ADM at various times during the 1970's and early 1980's, these recommendations were predicated upon the assumption that once the tank was full, ADM would be able to discharge the water someplace other than to the Homewood tributary. This was not possible until the Decatur sanitary district agreed in 1986 to accept all of ADM's storm water. This fact was explicitly acknowledged by many of the witnesses.

At trial, Homewood called Richard Kaptain, executive director of the sanitary district, as a rebuttal witness. He had worked for the sanitary district in various capacities for the last 16 years, the last two as executive director. Through this witness, Homewood attempted to show that ADM could have discharged its polluted storm water to the district prior to 1986.

Kaptain testified that no clean storm water was allowed to be discharged to the sanitary district prior to 1986 by any source. However, there were no standards governing what was to be considered "pol-

luted" storm water. When asked about the discharge of polluted water to the district, Kaptain gave the following responses:

"Q. [By plaintiff's counsel:] What about polluted storm water?

A. There was some question about that. Uh—we were concerned, if I recall. This has been a period of time for me, and I was not the manager at the time. I recall that—uh—we really didn't want any storm water but—uh—we were working within the limits of the Contract or the Agreement. I'm not sure I answered your question very straight.

Q. At that time were you receiving storm water from or did you agree to receive storm water from ADM that had a B.O.D. and Suspended Solids analysis greater than what they could discharge in—uh—accordance with an N.P.D.E.S. Permit?

A. If you will give me a minute. Uh—I don't think we ever agreed to—uh—accept storm water per se. We were concerned with the capacity of the 18-inch interceptor on Division and 34th Street. Though—uh—I'm trying to work with my memory here. There's some question about whether we would accept some polluted water—uh—with a very limited volume. We might have done that. I truly can't remember."

The only thing that is clear from this testimony is that Kaptain had no knowledge of whether ADM could have discharged its polluted storm water to the sanitary district prior to 1986. Given all the testimony to the contrary on this question, the evidence overwhelmingly supported ADM's claim that it could not have done anything with the storm water, even if it had built the storage facilities to capture 100% of the rainwater which fell on the west plant. Once the facilities were full they would be useless, and all storm water would once again inevitably be discharged to the Homewood tributary.

The gist of Homewood's punitive damage claim against ADM is that ADM's failure to build storm water holding facilities large enough to prevent any discharges to Homewood was intentional and constituted wilful and wanton misconduct, which proximately resulted in damage to the lake. However, it was not the holding facilities themselves which caused the discharges. ADM's west plant is in the Homewood lake's watershed. All storm water from that 380-acre watershed naturally drained to Homewood. The purpose of ADM's storm water facilities was merely to improve the quality of the storm water before it entered the tributary. Regardless of whether those storm water facilities existed, rainwater would have drained from the west plant grounds to the tributary. In fact, it may be suggested that the evi-

dence showed that had those facilities not been in place, water would have sheet discharged off the plant grounds, resulting in greater pollution in the water than had it been treated in the storm water clarifier or the first flush discharged to the sanitary district.

■ Homewood also relies upon ADM's failure to comply with its agreement with the USEPA in connection with its 1975 NPDES permit that it would achieve compliance with the effluent limitations of its permit by submitting engineering studies, preliminary plans, and starting and completing construction of facilities by certain dates. Homewood says this is evidence of ADM's wilful and wanton misconduct and that such conduct itself justifies punitive damages. We disagree with this contention. This failure was not the proximate cause of the Homewood lake pollution or evidence of ADM's wilful and wanton misconduct. It must be noted that Homewood did not plead in count II of its complaint that this failure was a proximate cause of any damage to the lake. As indicated in the issues instructions to the jury on that count, Homewood claimed, and had to prove, that failure by ADM to build facilities to hold all rainwater falling on the plant was wilful and wanton and that this failure caused damage to Homewood. All of the pre-July 23, 1979, evidence, including the failure to abide by USEPA mandates, was admitted for the limited purpose of showing notice to ADM of the discharges and the wilfulness and wantonness of its conduct in discharging its storm water to Homewood. The jury was instructed that it could not consider this evidence on the issue of damages. Thus, this conduct could not support an award of damages, either compensatory or punitive.

Further, under evidence adduced at trial, ADM's failure to abide by these USEPA mandates was not evidence of its wilful and wanton misconduct as to the post-July 23, 1979, discharges. While we do not condone ADM's failure to comply with USEPA directives, it is clear that the purpose of the directives was to allow ADM to meet the limitations of its NPDES permit, limitations that were described by one expert witness as "stringent." Another expert acknowledged that storm water runoff from the K mart parking lot would not meet such limitations. Yet another expert stated that water meeting the effluent limitations would be drinkable. It was not specified in this agreement with the USEPA what facilities were to be constructed or other steps taken to meet the effluent limitations. Testimony at trial clearly indicates that no one knew what ADM could do to meet the limitations of its permit, short of preventing all discharges to Homewood. Evidence did show that ADM embarked on an expensive program of improvements to the plant for the purpose of reducing dust and other mate-

rial on plant grounds that rainwater would come in contact with, in an effort to improve the quality of the discharges to Homewood.

■ Homewood would have us affirm the punitive damage award, when evidence shows this would merely serve to punish ADM for failing to do the impossible. However, this would clearly be improper under the standards discussed above. The failure of ADM to build facilities to capture 100% of the rainwater which fell on the west plant was not done with the intent to harm Homewood. Nor was it done with utter disregard for the safety of Homewood. The evidence, taken in its light most favorable to Homewood, simply does not warrant the award of any punitive damages under count II of its complaint, and the trial court erred in denying ADM's motion for judgment *n.o.v.*

We now turn to the compensatory damage award. ADM claims the verdict was against the manifest weight of the evidence and that the trial court erred in denying its motion for judgment *n.o.v.* as to counts I and III. The parties also disagree as to the proper measure of damages. However, in view of our holding, we need not reach this latter question.

■ Count I alleged intentional conduct on ADM's part in not building a storm water retention tank adequate to hold all the rainfall on ADM's plant site. Thus, count I stands on much the same footing as does count II. As to count II, we have already decided that ADM's conduct in this regard was not wilful or wanton. Similarly, its conduct was also not intentional and, to the extent the jury's verdict was based on count I, it cannot stand. We will therefore focus our attention on count III, which alleged negligence.

Homewood claims it proved, by a preponderance of the evidence, that ADM's actions were responsible for the condition of the lake bed. Homewood did show that ADM discharged various quantities of organic material into the lake via its storm water system and the tributary. However, in order to establish ADM's liability, Homewood was required to show that ADM's action in discharging this material was a proximate cause of the alleged damage. That damage consisted of black and oily lake bottom deposits that smelled bad, a seriously reduced oxygen level in the lake, and excessive sediment in the lake causing it to be too shallow to support aquatic life and recreational activities.

Proximate cause is one which causes injury or damage through a natural and continuous sequence of events unbroken by any effective intervening cause. (*Millette v. Radosta* (1980), 84 Ill. App. 3d 5, 24, 404 N.E.2d 823, 837.) A plaintiff must prove it is more probable than not that the defendant's conduct caused the injury complained of. (See

*Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 394, 493 N.E.2d 1022, 1029.) Whether a defendant's conduct is to be considered a proximate cause of the injury complained of presents a question for the trier of fact. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 23, 310 N.E.2d 9, 12.) The defendant's act need not be the sole, last, or nearest cause of the injury. It is sufficient if it occurs with some other cause acting at the same time which, in combination therewith, causes the injury. (*Kinsch v. Di Vito Construction Co.* (1964), 54 Ill. App. 2d 149, 154, 203 N.E.2d 621, 624.) In addition, to be recoverable, damages must be actual—not speculative, remote, or uncertain. *Chicago Title & Trust Co. v. Walsh* (1975), 34 Ill. App. 3d 458, 471, 340 N.E.2d 106, 115; *York v. Grand Trunk Western R.R. Co.* (1979), 71 Ill. App. 3d 800, 806, 390 N.E.2d 116, 121.

Homewood relies on the expert testimony of professional engineers Daniel Goodwin and Thomas Berns that, in their respective opinions, ADM was the cause of much of the condition of the lake's bottom deposits. ADM insists these opinions were based on speculation and conjecture.

It is well established that an expert may not guess or state an opinion based upon conjecture. *Coffey v. Brodsky* (1987), 165 Ill. App. 3d 14, 24, 518 N.E.2d 638, 644; *Wehmeier v. UNR Industries, Inc.* (1991), 213 Ill. App. 3d 6, 23, 572 N.E.2d 320, 332.

■ It is undisputed that storm water discharges from ADM rarely, if ever, met the effluent limitations of its NPDES permits. For the reasons discussed above, any negligence on ADM's part did not arise from the configuration of its storm water treatment system. However, from the evidence presented to it, the jury could have found negligence on ADM's part in the matters of housekeeping on plant grounds and in the two discharges that resulted from actions or inactions by ADM employees on July 28, 1979, and June 26, 1981. It could have found that these discharges resulted in the deposit of contaminated water into the lake. However, the difficulty with Homewood's case stems from a failure to connect ADM's post-July 23, 1979, discharges to the present condition of the lake.

Although both Goodwin and Berns testified that ADM was responsible for that condition, Homewood failed to produce any evidence to support those opinions. Even assuming that the jury could have properly concluded from the conflicting evidence that the 1981 testing done by the IEPA (which found no soybean oil in samples taken in late 1980) was flawed because of the method used, Homewood still produced no evidence that any material discharged by ADM

into the lake after July 23, 1979, remained there at the time of trial or was responsible for the condition of the lake.

Charles Jolly testified as to analysis of samples taken from the lake in early 1991. That analysis found organic materials deposited in the lake directly on top of the original lake bottom. On top of this organic material was fill material which had been used to create the dam built by Homewood residents in the mid-1960's, in an effort to reduce the silt buildup in the remaining two acres of the lake. He testified that under the law of superposition, the bottom layer is always the oldest. This testimony was not contradicted by Homewood. Obviously, this would mean that the organic material was deposited prior to July 23, 1979. John Guillou also testified with reference to these soil samples. His opinion also was that the organic material had been deposited prior to the fill material—well before 1979. There was no evidence produced tending to show that any organic material discharged by ADM after July 23, 1979, was still in the lake.

The fact that the bottom deposits had an offensive odor or were black and oily does not, by itself, connect those conditions to ADM. Although there was an abundance of evidence that ADM did discharge pollutants into the lake over the years, the undisputed testimony of all the experts was that this material was biodegradable. However, no one could say how long this process would take. Thomas Berns testified that he had no knowledge of how much organic material was discharged by ADM since July 23, 1979, how much might have gone on to Lake Decatur, or how long it would take for the materials that stayed in the Homewood lake to biodegrade. Moreover, he testified there was no way in which to determine, with precision, the amount of fats, oil, and grease existing in the lake's bottom deposits. While we recognize that precision is not required, there was no scientific evidence of any fats, oil, or grease in the lake bed. Simply feeling the sediment between one's fingers, even those of a distinguished scientist such as Goodwin, is inadequate to establish ADM's liability.

It was clear from the evidence that the lake's problems began many years prior to July 23, 1979. As early as 1946, Homewood residents were concerned about the condition of the lake, as the north end was filling up with sediment. In 1947, a portion of the lake was separated to serve as a sediment basin. In 1961, Homewood residents were advised by the Conservation Department that the water in the lake was too shallow and lacked sufficient oxygen to support an adequate fish population. In 1962, residents drained the lake and filled in the northern portion of the lake in an effort to reduce the amount of silt going to the south part of the lake. The northern part had filled in

to the point that it had become swampy and mosquito infested. The bottom deposits of that part of the lake smelled bad when disturbed. In 1962, there were already several feet of silt in the south half of the lake. One witness described it as a black mucky mess. Some of the expert witnesses who testified stated that a lake the size of Homewood, with its excessive watershed, would require a regular program of dredging to maintain its viability. There is no dispute that this was not done. No evidence was adduced to tie ADM's storm water discharges to the excessive siltation in the lake. Testimony established these deposits were the result of a too large watershed. There was no evidence that ADM's post-July 23, 1979, discharges caused the lake's pre-1979 condition to worsen.

We are cognizant that a jury verdict is not to be overturned on appeal unless, having viewed the evidence in the light most favorable to the plaintiff, the reviewing court determines the verdict to be clearly erroneous or against the manifest weight of the evidence. (*Rice v. Merchants National Bank* (1991), 213 Ill. App. 3d 790, 801, 572 N.E.2d 439, 446-47, *appeal denied* (1991), 141 Ill. 2d 559, 580 N.E.2d 133.) A verdict is contrary to the manifest weight of the evidence only when the verdict is wholly unwarranted by the evidence or is clearly the result of passion or prejudice. *Curry v. Summer* (1985), 136 Ill. App. 3d 468, 482, 483 N.E.2d 711, 721.

Having reviewed the evidence with these standards in mind, we find that the jury's verdict was against the manifest weight of the evidence as to count III of Homewood's complaint and that the trial court erred in denying ADM's motion for judgment *n.o.v.* as to this count. The verdict of the jury and the judgment of the trial court thereon must therefore be reversed.

Reversed.

STEIGMANN, P.J., and COOK, J., concur.