2020 IL App (1st) 181109-U

Nos. 1-18-1109, 1-18-1154 cons.

Second Division
September 8, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| QUENTIN RAVIZZA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 L 1503 (cons. with 13 |
| | ) | L 10907) |
| PACCAR, INC. and DISTRICT | ) | |
| REBUILDERS, INC., | ) | Honorable |
| | ) | Robert Senechalle, |
| Defendants-Appellants. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices Ellis and McBride concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   Affirmed in part and vacated in part. The circuit court's denial of defendants' motion for judgment notwithstanding the verdict, or alternatively, for a new trial is affirmed where the evidence supports the jury's finding of negligence, the jury verdicts were not inconsistent and against the manifest weight of the evidence, the jury was properly instructed, defendant's request for separate verdicts and special interrogatories was properly denied, the court properly admitted expert testimony and evidence of similar prior incidents, and properly excluded testimony pertaining to inspections. The circuit court's denial of remittitur is affirmed where the award of compensatory damages was not excessive. The award of punitive damages is vacated where the facts show the SCH system was absent from the Truck.

¶ 2    Plaintiff-Appellee, Quentin Ravizza,[1] was a commercial tow truck driver employed by District Recovery, Inc. ("Recovery"). In January 2012, plaintiff sustained injuries, including a fractured skull and the loss of an eye when the hood of a Kenworth T800 Truck fell on his head. Plaintiff filed suit against defendants-appellants, PACCAR, Inc. ("Paccar") and District Rebuilders, Inc. ("Rebuilders") (collectively, "defendants"), alleging negligence in design, manufacture, and maintenance of the Truck. The jury allocated fault among the parties, finding plaintiff at 5% fault, Rebuilders at 25% fault, and Paccar at 70% fault. The circuit court entered judgment on the verdict in favor of plaintiff and against both defendants in the amount of $10 million in compensatory damages and $10 million in punitive damages against Paccar alone. Defendants subsequently filed post-trial motions seeking, *inter alia*, a judgment notwithstanding the verdict, a new trial, an off-set on damages, and a remittitur pursuant to 735 ILCS 5/2-1202 (West 2012). Following a hearing, the court denied defendants' motions but reduced the $10 million compensatory damages award against Paccar to $9.5 million. Defendants now appeal, and for the reasons that follow, we affirm the judgment of the circuit court but vacate the award of $10 million in punitive damages.

¶ 3                                   I. BACKGROUND

¶ 4                                   A. The Accident

¶ 5    Plaintiff was a tow truck driver employed by Recovery. He was assigned to a 1997 Kenworth T800 Truck ("Truck 55"),[2] which was manufactured by Paccar and designated as a heavy-duty tow truck. On January 23, 2012, plaintiff was sent to tow a UPS freight truck. As

---

[1] The Notice of Appeal for No. 1-18-1109 spells the plaintiff-appellee's name as "Rivizza," whereas the Notice of Appeal for No. 1-18-1154 spells it as "Ravizza." Because our review of the record makes clear that the correct spelling is "Ravizza," we follow the Notice of Appeal in No. 1-18-1154.

[2] The trucks at Recovery were known by number designations.

he was driving on Harlem Avenue and 60th Street in Chicago, Illinois, Truck 55 experienced mechanical problems and stalled in traffic. Plaintiff radioed Recovery for assistance and was informed that a mechanic from Rebuilders[3] would come to the scene to inspect the vehicle. In the meantime, plaintiff stepped out of the vehicle to the driver's side, opened the hood, looked underneath, and inspected the engine for mechanical issues. Shortly after, a gust of wind estimated at 35 miles per hour blew the hood shut. Plaintiff's head slammed against the Truck's engine and as a result, he sustained multiple injuries including a fractured skull and the loss of an eye.

¶ 6                                    B. Plaintiff's Complaint

¶ 7        Relevant to this case are allegations contained in plaintiff's third amended complaint. In his third amended complaint, plaintiff alleged that Paccar negligently designed and manufactured Truck 55 without a reasonably safe hood blowback protection system, and that Rebuilders was negligent in its removal or failure to replace Truck 55's safety cable and hook system ("SCH system"). The complaint further alleged that Paccar's conduct was willful and wanton, and therefore, warranted additional relief in the form of punitive damages. Specifically, plaintiff alleged that Paccar knew that the safety cable it designed to prevent unintended hood closures did not work and that severe injuries would result from hood blowback and hood closures.

¶ 8                                         C. Jury Trial

¶ 9        On June 5, 2017, the case proceeded to jury trial. Prior to trial, the parties filed motions *in limine*. Rebuilders' motions included a motion to bar or limit expert testimony expanding the scope of its contractual duties. The circuit court reserved ruling on the motion pending the

_____

[3] Rebuilders provided mechanic services and operated from the same building as Recovery.

actual trial testimony of the witnesses. Plaintiff filed a motion to bar testimony regarding safety inspections performed on Truck 55 by the Illinois State Police, which the court granted.

¶ 10         The jury trial consisted of the testimony of approximately 28 witnesses, including plaintiff. The witness testimony relevant to this appeal follows.

¶ 11         Plaintiff testified that he began working for Recovery in 2009. He was initially assigned to smaller vehicles but was later assigned to Truck 55, a heavy-duty vehicle that was outfitted to tow trucks. Plaintiff testified that Truck 55 did not have a SCH system, and he had no knowledge of the hood ever being replaced or the safety cable and hook being removed. Plaintiff testified that it was windy on the day of the accident when he attempted to inspect the engine of Truck 55 by fully opening the hood. As he was looking at the engine, the hood blew down on him. After the accident, plaintiff underwent multiple surgeries and could no longer work as a truck driver. However, he later entered trade school in 2012 to be an electrician. As of the date of trial, plaintiff worked as a full-time "journeyman electrician."

¶ 12                              1. Plaintiff's Witnesses

¶ 13         Plaintiff called, among others, the following five witnesses: Robert Zolner and Andres DeJesus (both deceased at the time of trial but presented by their discovery deposition transcripts), Sherry Radwanski, Greg Ragle, and Dr. Anand Kasbekar.

¶ 14         Robert Zolner worked as a shop foreman and chief mechanic for Rebuilders since 1998. As of February 2012, Zolner, in his role as shop foreman, was responsible for maintaining records on the vehicles. Zolner described Rebuilders' maintenance records kept prior to 2012 to be "[v]ery sketchy." With respect to Truck 55, Zolner testified that Rebuilders performed preventative maintenance, which consisted of "[g]oing over the entire truck, chang[ing] the fluids, greas[ing] it, check[ing] the brakes, mak[ing] sure they're safe to be on the road." He

further testified that Truck 55's hood was never changed while he worked there, did not have a device to prevent hood blowback, and no such device had ever been removed by Rebuilders.

¶ 15      Andres DeJesus was the general manager of Recovery. He testified that he drove Truck 55 between 1999 and 2001. He never saw any safety device on the hood of Truck 55 while he used it and never had the safety device been removed. DeJesus also testified that Zolner and Rebuilders performed preventative maintenance on the Recovery trucks. DeJesus defined preventative maintenance as follows: "They go through everything. They measure the shoes to make sure the brakes are proper, they check the slack adjustors, they get the front ends up in the air, they check king pins, tie rods, drive shaft, everything." DeJesus had no knowledge of Truck 55's hood ever having been replaced. He testified that the underside of the hood when photographed after the accident was in the exact same configuration as when he drove the Truck from 1999-2001.

¶ 16      Sherry Radwanski owns Recovery and Rebuilders and has been involved with these companies since 1998. Radwanski testified that Recovery never loaned or leased Truck 55 to another company and she never saw any work done on Truck 55 other than a paint job. Radwanski further testified that Truck 55 has never been in an accident.

¶ 17      Greg Ragle testified that he began working as a truck driver for Conoco in 1991. Like plaintiff, he drove a Kenworth T800 Model Truck. Ragle testified that the T800 Truck he drove was equipped with a SCH system. On April 15, 1991, Ragle opened the truck's hood to check for oil. He attached the cable to a hook located on the truck's hood and stepped away. A strong gust of wind then blew the hood down. Ragle observed that the hook had failed. After this "near miss" incident, Ragle used a prop rod as a safer alternative to prevent the hood from

being blown shut. Conoco reported both the incident and Ragle's alternative design to Paccar in 1991.

¶ 18      Dr. Anand Kasbekar has a Ph.D. in mechanical engineering and materials science from Duke University. At Duke, he took courses in "thermodynamics, strength of materials, statics, dynamics, mechanical design," corrosion, and product safety and failure analysis. His work experience includes working at a company called MPR in Washington, D.C. where he did work in the area of failure analysis of power plant components, navy vessels, aircraft carrier propellers, and propulsion systems. He has worked for a company where he performed product defect investigation and analysis.

¶ 19      Dr. Kasbekar also teaches a course at Duke University every year on failure analysis and prevention. Specifically, he instructs students on how to evaluate loads on devices and its composition. He further instructs on how to identify component failure due to overload or fatigue and how these deficiencies can be addressed. Lastly, he has served on the governing board of the North Carolina Chapter of the Society of Automotive Engineers, a society of engineers working in the automotive, heavy truck, and heavy equipment manufacturing disciplines.

¶ 20      After three months following the accident, Dr. Kasbekar testified that he was permitted to examine Truck 55 which was with Rebuilders. In addition to examining Truck 55, Dr. Kasbekar looked at other trucks, including those in the T800 series. He also examined various documents provided to him, including deposition transcripts of the individuals that plaintiff worked with, plaintiff's own deposition, and deposition of individuals who worked for Paccar. Further, Dr. Kasbekar examined a variety of materials from "Paccar and Kenworth including safety videos that were made in 1992 and 1996 that show[ed] various different [safety]

devices" implemented on its vehicles. The 1996 video, provided with the sale of Truck 55, showed the following three hood blowback safety devices: (1) the "strut system", (2) the "prop rod" or "stop rod" system, and (3) the "hinge locking" or "hood latch" system. However, it did not feature the SCH system. According to Dr. Kasbekar, some of these devices were "automatic" or "passive" in that they do not require the user to activate them whereas other devices were "active" as they require the user to "activate them such as the hook and cable system involved in the subject truck."

¶ 21    The first device is a "strut system," which Dr. Kasbekar categorized as an "automatic" or "passive" device. He did not "X-ray or disassemble" the strut system but described the system as consisting of a coil spring with some "dampening fluid." He noted that the strut system "attaches to the frame of the truck" and "when the hood is open, this device automatically locks the cylinder in an extended position." Unlike the SCH system, Dr. Kasbekar noted that the strut system holds the hood in a 90-degree position and does not allow the hood to rotate back. Although the strut system does not require the user to engage the device, it requires the user to disengage or release the device to close the hood. Dr. Kasbekar further noted that clear warnings and instructions as to the locked and unlocked position were generally included on the decal of the strut system. He also opined that attaching the system to the "frame of the truck and being one component" is "important because if you have a situation that requires you to pull the hood for any reason, the likelihood of the safety device being reinstalled is greater." This is because the large system object is apparent, and its purpose is clear. Dr. Kasbekar opined that even in the absence of "any warnings, any training, [and] any instruction," the user would know "what the device is because in order to close the hood, you've got to go up to this device and lift up on the handle."

¶ 22        In contrast, the SCH system is mounted on top of the radiator and to use it, the user must first locate the cable and then identify the hook. Dr. Kasbekar noted that there is "no color coding" to bring attention to the SCH system and it appears that the system "takes on the color of the surrounding components over time, and what the user has to do is identify it, reach into the area of the radiator, extend out the cable, and loop it over the hook." Dr. Kasbekar opined that this may cause injury as the surrounding area of the radiator can get hot and the radiator itself is "inches away from the fan blade." He also noted that the warnings used on other trucks with the SCH system "don't really have clear instructions as to how to use" it.

¶ 23        Next, Dr. Kasbekar testified as to the "prop rod" or "stop rod" system. According to Dr. Kasbekar, the prop rod system was installed onto other Kenworth vehicles at the time Truck 55 was manufactured. The prop rod system was not a passive device as it required the user to identify and deploy it. The prop rod system is color coded as red, includes a mounted bracket on a "support part of the structure," and is "stowed against the front grill of the hood." Once engaged, the prop rod secures the hood from moving back. Dr. Kasbekar opined that the prop rod system was not better than the strut system. However, the prop rod system was superior to the SCH system as it prevented the hood from partially closing and its red color grabbed a user's attention as the color is "associated with a safety mechanism or an area of danger."

¶ 24        The third device is a "hinge locking" or "hood latch" system which is a passive system used in 300 series trucks. The hinge locking system includes two metal pieces, one of the pieces mounts to the frame of the truck whereas the other mounts to the hood. Dr. Kasbekar opined that the hinge locking system was superior and a safer design than the SCH system. Essentially, Dr. Kasbekar opined that all three of the other safety devices Paccar used on its other truck models in 1997 as well as the automatic locking device that Mack, a competing manufacturer,

used on its trucks at that time were safer than Paccar's SCH system. Dr. Kasbekar stated that any of these other devices could have easily been used on Truck 55. He testified that the SCH system posed risk of harm as it would not stop the hood from blowing back until it had already blown partway down. In fact, a user looking under the hood could still be hit by it, depending on his position, or could be put in a dangerous position by being startled. Dr. Kasbekar testified that it was more likely that plaintiff would have been hit by the hood even if a SCH system was present on Truck 55. He further opined that the SCH system was also defective because it was likely to break down over time. Specifically, he testified that the "shock load" would cause the hook to separate from the hood if engaged on multiple occasions over time. He suggested that the galvanized steel cable could also break due to age and repeated use. In support, Dr. Kasbekar referenced two prior incident reports Paccar received regarding situations where the hook had separated from the fiberglass hood.

¶ 25    Lastly, Dr. Kasbekar testified as to his review of Paccar's "Automatic Positive Hood Safety Lock" patent, which was filed in 1994, three years prior to the manufacture of Truck 55. Dr. Kasbekar noted that Paccar's patent discussed issues pertaining to its existing SCH system and therefore, indicated that Paccar was aware of the serious injury posed by it.

¶ 26                                    2. Paccar's Witnesses

¶ 27    Gratzianna testified that he worked as a full-time firefighter for the Palatine Fire Department since 1995 and, served as the department's Deputy Chief since 2008. He had "dual experience in both fire and towing" because he held "both careers for [approximately] 25, 30 years." With respect to his towing experience, Gratzianna testified to having worked for various tow truck companies, including a family-owned truck service company. There, he "established a safety training program," was involved with driver selection, and did regulatory

compliance work. Gratzianna testified that his role at "some companies *** was to establish the maintenance program, get it up to compliance and also teach the supervisors and mechanics there so they can maintain it." Although he was not a mechanic, Gratzianna could recognize whether a truck was properly serviced based on this experience and training in the industry. Gratzianna also lectured and had written extensively on a variety of subjects related to towing safety and operations. Gratzianna opined that based on his review of the materials and depositions in the case, Rebuilders was "delegated the responsibility for maintaining the vehicles" for Recovery and was the only entity responsible for the general maintenance and safety of Truck 55 for about 13 years. Given its delegation, Gratzianna opined that Rebuilders was required to "inspect, repair, and maintain all of [Recovery's] vehicles" and to ensure parts and accessories were in "safe and proper operating condition" but failed to do so with respect to Truck 55.

¶ 28        Adam Salnick testified that he worked at Kenworth Trucks, Inc. ("Kenworth") as an engineering section manager. He was asked to examine Truck 55 to determine whether it had a genuine Paccar hood and other genuine "Paccar/Kenworth parts." Salnick observed that Truck 55 did not have a Paccar part number plate on its hood. This indicated that the hood was not a genuine Paccar/Kenworth part. The hood was also improperly positioned on the chassis, was missing the hook on the inside, and lacked pre-drilled holes. Contrary to specification, Salnick stated that the wiring for the turn signal also did not run through the reinforcement on Truck 55's hood. Lastly, Salnick testified that the radiator on Truck 55 was not stamped with the name of Kenworth's supplier, which further indicated the radiator was not a genuine Kenworth part.

¶ 29        Anthony Steele testified that he started working at Kenworth in 1988 as a mechanic. He initially worked in the "test department," which is responsible for final repairs on trucks before it leaves the factory. In 1996, Steel started working in Kenworth's "quality department," where he was in charge of "inspection" and "operation" of truck parts. In 1997, Steel served as a quality inspector at a Kenworth plant in Chillicothe, Ohio. Steel testified that the truck hoods came "from a supplier, which was directly across from [the facility]. As the hoods would come in, they would be inspected before they entered [the] paint department." The "paint department" would label the hood with a chassis number and sequence number so as to identify which trucks the hoods belonged to. Steele stated that he wasn't present or involved in Truck 55's inspection but testified as to its chassis checklist prepared by John Grubb, a retired Inspector. Steele noted that the checklist included a section pertaining to the hood installation and safety cables. A "squiggly line" was drawn through the column of this section as well as a column for steering operation. Steele testified that when making inspections, some draw a "line" through the column whereas other "check them off," or "don't check anything off." He noted that there was "no policy that directs the inspectors on how to go about and show their work." Steele also testified as to a 1997 dealer warranty claim document pertaining to Truck 55. The document revealed that the dealer had found the steering was misadjusted and required repair even though the steering operation was checked by Grubb at the Kenworth Chillicothe plant. The truck's paint was also "checked" during inspection but was subject to a claim by a customer who noted that the paint was "peeling at the rear axles" and that the "axles [were] not prepped properly before shipping."

¶ 30                    C. Jury Instructions & Verdict

¶ 31       After three weeks of evidence, the jury was given issue instructions (I.P.I. 20.01.01) pertaining to both defendants. With respect to Paccar, the jury was given the following two instructions: "Designed the truck at issue without an adequate safety system to prevent the hood from unexpectedly closing" (negligent design); "Manufactured the truck at issue without an adequate hood safety system to prevent the hood from unexpectedly closing" (negligent manufacture). With respect to Rebuilders, the issues instruction was as follows: "Removed the safety cable and hook and failed to reinstall it;" "Failed in its maintenance of the truck at issue to repair or replace the safety cable and hook;" or "Permitted the truck to return to service without the safety cable and hook attached."

¶ 32       The jury returned a verdict in favor of plaintiff and against defendants. As outlined in Verdict Form "A," the jury found that plaintiff was entitled to a total amount of $10 million in compensatory damages, itemized as follows: $2.5 million for "disfigurement resulting from the injury;" $1.25 million for "disability experienced;" $2.5 million for "disability reasonably to be experienced in the future;" $1.25 million for "pain and suffering experienced as a result of the injuries;" and $2.5 million for "pain and suffering reasonably certain to be experienced in the future as result of the injuries." The jury further allocated the fault of the negligence as: 5% to plaintiff; 25% percent to Rebuilders; and 70% to Paccar. Lastly, the jury found that Paccar's conduct was willful and wanton in its design of the Truck and thus awarded punitive damages in the amount of $10 million.

¶ 33       In reaching its verdict, the jury answered the following special interrogatory in the affirmative: "Was the hook and cable blow back safety system for the subject truck inadequately designed by Paccar?"

¶ 34                                   D. Post-Trial Motions

¶ 35    Defendants subsequently filed post-trial motions pursuant to 735 ILCS 5/2-1202 (West 2012). Paccar moved for a judgment notwithstanding the verdict, a new trial, an off-set on damages, and a remittitur. Paccar argued that it was entitled to a judgment notwithstanding the verdict because plaintiff failed to prove proximate cause, there was no evidence of willful and wanton conduct, and there was no admissible expert evidence to support the verdict. Paccar also argued that a new trial was warranted because the verdict was against the manifest weight of the evidence and the court's evidentiary rulings deprived it of a fair trial. Like Paccar, Rebuilders contended that it was entitled to a new trial because of the court's erroneous rulings on evidentiary matters. Both defendants argued that the general verdict was inconsistent as the jury's finding that Rebuilders was liable meant that it found the SCH system to be adequate and would have prevented the accident had it been present on Truck 55, whereas the verdict against Paccar was based on the contrary finding that the SCH system was inadequate and would not have prevented the accident.

¶ 36    On March 28, 2018, the court heard oral arguments on the post-trial motions. Following a hearing, the court denied defendants' motions but reduced the $10 million compensatory damages award against Paccar to $9.5 million. In denying Paccar's motion, the court rejected Paccar's argument that plaintiff had failed to prove a causal link between the claimed defects in the SCH system and plaintiff's injuries. The court noted that the jury could have found the SCH system was inadequately designed because it had a tendency to break due to age and repeated use and that the absence of the SCH system on Truck 55 was due to this design flaw. The court also found that plaintiff would have been injured even if the SCH system had been on Truck 55 and had been engaged on the day of the accident. In ruling on Rebuilders' motion, the court noted that the jury could have found that the SCH system would have prevented the

accident but was missing because it broke due to Paccar's negligent design and was not replaced due to Rebuilders' negligence.

¶ 37                                    II. ANALYSIS

¶ 38        On appeal, Paccar contends that it is entitled to judgment in its favor because plaintiff failed, as a matter of law, to prove negligence. Alternatively, Paccar argues that it is entitled to a new trial because (1) the jury verdicts are inconsistent and against the manifest weight of the evidence; (2) the circuit court improperly instructed the jury; (3) the circuit court erred in refusing Paccar's request for separate verdicts and special interrogatories; and (4) the circuit court improperly admitted expert testimony and evidence of similar prior incidents. Lastly, Paccar contends that the compensatory damages award should be remitted because it is excessive and the $10 million punitive damages award should be vacated because plaintiff failed to prove that Paccar's design of the SCH system was willful and wanton or that it caused plaintiff's injury.

¶ 39        Rebuilders, on the other hand, argues that the circuit court erred in (1) finding that it had a duty to replace the safety cable and hook; (2) denying Rebuilders' motion for judgment not withstanding the verdict because the general verdict was irreconcilable with the jury's response to the special interrogatory; (3) allowing an unqualified witness to testify against Rebuilders, which expanded the scope of its maintenance duties beyond its agreement with Recovery; (4) excluding testimony of inspections conducted by the Illinois State Police; and (5) denying remittitur following a compensatory damages award in excess of that supported by evidence.

¶ 40                          A. Negligent Design & Manufacture

¶ 41    Paccar argues that it is entitled to a judgment notwithstanding the verdict. Specifically, Paccar argues that its SCH system must have been removed after manufacture and that its design and manufacture of Truck 55 could not have caused plaintiff's injuries.

¶ 42    Generally, a judgment notwithstanding the judgment (JNOV) is properly entered in limited cases where all of the evidence, "when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). In determining the propriety of a JNOV, a reviewing court does not reweigh "the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Id.* A JNOV may not be granted merely because a verdict is against the manifest weight of the evidence. *Id.* We review a trial court's denial of a motion for JNOV *de novo. Ford v. Grizzle*, 398 Ill. App. 3d 639, 650 (2010).

¶ 43    In a product liability action asserting a claim based on negligence, a plaintiff must establish (1) the existence of a duty of care owed by the defendant to plaintiff; (2) breach of that duty; and (3) an injury proximately caused by that breach. *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 271 (2007). The main distinction between a negligence claim and a strict liability claim is the additional element of fault. *Id.* at 270. In a strict liability claim, the focus is on the condition of the product. However, in a negligence claim, as is the case here, a defendant's fault is at issue in addition to the condition of the product. *Id.* In other words, not only must plaintiff prove that the product was not reasonably safe, but also that the defendant knew, or should have known of that unsafe condition. *Brobbey v. Enterprise Leasing Co. of Chicago*, 404 Ill. App. 3d 420, 430 (2010).

¶ 44                                    1. Negligent Design

¶ 45        For a negligent design claim, the crucial questions are "whether the manufacturer exercised reasonable care in the design of the product and 'whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous.'" *Sobczak v. General Motors Corp.*, 373 Ill. App. 3d 910, 923 (2007) (quoting *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 255 (1990)). To establish that a manufacturer acted unreasonably based on the foreseeability of harm, "a plaintiff must show that the manufacturer knew or should have known of the risk posed by the design at the time of the manufacture." *Id.*

¶ 46        Paccar argues that it is "highly unlikely" that the jury's general verdict finding negligent design was based on the reasoning provided by the circuit court. Paccar points out, "the circuit court theorized that the jury could have found Truck 55 left the Kenworth factory with the SCH system intact but that, at some point ***, the cable snapped or the hook broke off [during normal use due to its defective design] and District Rebuilders failed to replace it." Although "plaintiff's expert did opine that the SCH system could fail due to use and age," Paccar contends that there was no evidence that this design defect had caused the system on Truck 55 to fail and be removed. Instead the only plausible explanation for the absence of the SCH system on Truck 55 was that the entire system was removed along with the hood and radiator after it left Paccar's control.

¶ 47        Although we are mindful of Paccar's argument that its SCH system may have been removed after manufacture given that the hood and radiator were replaced with aftermarket parts, there is considerable evidence to support the jury's general finding of liability against Paccar based on negligent design. We first note that Paccar had a duty to design the subject truck with a hood blowback safety device to prevent the hood from blowing down on a person

underneath the hood. See *Sobczak*, 373 Ill. App. 3d at 923 (providing that a "manufacturer has a nondelegable duty to produce a product that is reasonably safe for all intended uses."). Aside from the theories advanced by the circuit court, the jury could have reasonably found that Paccar breached its duty by designing the SCH system in such a manner that made it subject to removal or when removed, not be recognizable as a safety device by end users and then replaced.

¶ 48    Notably, the SCH system design is such that the device is mounted or attached to the radiator as opposed to being affixed to the main frame of the truck. Dr. Kasbekar testified that the location of the device is significant because the likelihood of a safety device being reinstalled after removal of the hood is greater when the system or device is attached to the frame. As such, the jury could find that the SCH system was inadequately designed as it is likely that the device would go unnoticed and not be reinstalled in the event of repairs or replacements. Alternatively, the jury could have found that the SCH system was inadequately designed as it would not be recognizable as a safety device by users. To that point we note for instance, the SCH system did not include any color coding which would draw attention to it or make it clearly visible to users. Instead, the system appeared to camouflage with the surrounding components. Although warning labels are used on other trucks with the SCH system, Dr. Kasbekar's testimony indicates that the instructions are unclear as to its use. Further, the 1996 safety video, sent with Truck 55, also did not include the SCH system as one of the blowback devices. Given the design of the SCH system, it should have been foreseeable that a user might not know what the device was or its intended purpose.

¶ 49    Our inquiry turns next to the third element in a negligence claim, proximate cause. Proximate cause is that cause, in the ordinary course of events, that produced the plaintiff's

injury. *Atchley v. University of Chicago Medical Center*, 2016 Ill. App. (1st) 152481, ¶ 45. With few exceptions, whether proximate cause exists is a question which falls within the purview of the jury. *Davis v. Marathon Oil Co.*, 64 Ill. 2d 380, 395 (1976); but see *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 318 (1942) (where the facts in a case are undisputed and reasonable men could not differ as to the inferences to be drawn from those facts proximate cause may be determined as a matter of law).

¶ 50    Proximate cause comprises two distinct requirements: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). Cause in fact is present when there is a reasonable certainty that a defendant's acts caused the injury. *Id.*  In deciding this question, we ask whether the injury would have occurred absent defendant's conduct. *Id.*  Legal cause presents a question of foreseeability and is established if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it. *Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002). To answer the legal cause question, we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct. *Lee*, 152 Ill. 2d at 455.

¶ 51    Here, the issue of proximate cause was properly submitted to the jury. As we have previously discussed, the jury could infer from the evidence that Paccar's design of the SCH system rendered the device unrecognizable as a safety device, which once removed, was not replaced. Had an adequate system been placed on the Truck 55, one with accompanying identifying decals, warnings, and safety instructions, it is likely that the device would have been recognizable for the purpose for which it was designed. Clearly, the type of injury suffered by the plaintiff was foreseeable, otherwise, Paccar would neither see a need for, design, test nor place a safety device of any kind on any its heavy-duty trucks. Based upon the

evidence presented at trial, it was not unreasonable for the jury to find that Paccar negligently designed the SCH system.

¶ 52                                    2. Negligent Manufacture

¶ 53        Paccar argues that plaintiff failed to show that its alleged negligence caused his injuries, because the mere fact that he suffered an injury on a truck manufactured fifteen years earlier does not support a negligence claim. We agree that the mere fact that an injury occurred does not give rise to a presumption or inference that the defendant was negligent. *Miszczak v. Maytag Chicago Co*., 11 Ill. App. 2d 496, 501 (1956) (quoting *Rotche v. Buick Motor Co*., 358 Ill. 507, 516 (1934)). The burden rests with the plaintiff to present some evidence to support his claims. *Id.* To prevail on a negligent manufacture claim, the plaintiff must establish that he sustained an injury as the proximate result of the defendant's breach of a duty owed to the plaintiff in connection with the defendant's product. *Phillips v. U.S. Waco Corp.*, 163 Ill. App. 3d 410, 417 (1987). Where the product failure can be attributed to a myriad of causes, the plaintiff cannot prevail. See *Shramek v. General Motors Corp.*, 69 Ill App. 2d 72 (1966) (holding that the mere occurrence of a blowout did not establish a manufacturer's negligence or that the tire was defective since blowouts can be attributed to a myriad of causes.)

¶ 54        Again, it is undisputed that Paccar had a duty of care to equip the truck with a hood blowback safety device which would prevent the hood from blowing down on a person underneath it. As previously explained, there was evidence that the SCH system, as designed by Paccar, would fail to prevent an injury even if present and functioning as intended. Additionally, we find that the lack of a SCH system on this particular truck cannot be attributed to multiple causes. Either no type of blowback system was ever on Truck 55, or it failed and was not replaced with the hood replacement, or it was unrecognizable as a safety device upon

being removed and not replaced. Under either scenario, the conduct relates back to Paccar's negligent design. Thus, we conclude that the jury could find that Paccar's duty of care was breached.

¶ 55     Paccar, nevertheless, argues that the missing SCH system was not a result of its own negligence. Rather, Paccar contends that the hood and radiator may have been replaced at some point after the Truck left its control and prior to the accident. Paccar points to Truck 55's transaction history, which shows that Paccar sold the truck to a Kenworth dealer in Tennessee in February 1997 who then sold it to Miller Industries ("Miller"). In December 1998, Truck 55 was purchased by Recovery from a dealer in Chicago. Although Paccar offered evidence suggesting that the hood and radiator may have been replaced at some point after Truck 55 left its control, Rebuilders' witnesses, who had knowledge of the truck's condition from the day it was purchased, testified that the hood had not been replaced and that no one from Rebuilders or Recovery had removed the cable and hook. The record also shows that Miller only modified Truck 55 by adding a boom and wrecker body to the back of the truck, which allows the truck to lift and tow other vehicles. Miller did not play a role in the removal of the hood or the blowback safety system as it was not the company's customary practice to remove hoods from the trucks it services. Miller's customary practice also did not include replacing original equipment and truck hoods with aftermarket hoods.[4] This leaves the Kenworth dealer. However, according to Paccar, the SCH system cannot be attributed to the Kenworth dealer because it "sold premium products at premium prices and had no intention to sell a truck that had cheaper 'knock-off' parts and lacked an important safety device."

_____

[4] On August 23, 2016, the circuit court granted Miller's Motion for Summary Judgment, finding that Miller was not liable to plaintiff for his injuries.

¶ 56    There is some evidence in the record, from which a jury could very well conclude that the SCH system was not removed by Recovery or Rebuilders or others in the transaction chain, but was instead, missing at the time it was manufactured. We recall that there is evidence in the record to the effect that the safety video delivered with Truck 55 did not include in its content the SCH system. Even accepting that a superseding cause broke the causal relation between Paccar's negligence and plaintiff's injury, it would have at most raised a question of fact for determination by the jury. See *Mitchell v. Four States Machinery Co.*, 74 Ill. App. 2d 59, 76 (1966). The fact that the evidence might also support a conclusion different than the one reached by the jury does not warrant the judgment to be set aside. See *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999) (stating that a court cannot "set aside a verdict merely because the jury could have drawn different inferences or conclusions.").

¶ 57    Assuming, *arguendo*, that the hood and radiator were replaced at some point after Truck 55 left Paccar's control, Paccar's argument that plaintiff's injuries cannot be attributed to Paccar lacks merit. This is because "there can be more than one proximate cause of an injury." *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 57 (1996). The defendant may be liable even if his or her negligence is not the sole proximate cause of the plaintiff's injuries as long as his conduct contributed in whole or in part to the injury. *Pell v. Victor J. Andrew High School*, 123 Ill. App. 3d 423, 430 (1984). When there is more than one proximate cause of an injury, one guilty of negligence cannot escape responsibility merely because another is also culpable of negligence contributing to the same injury, even though the injury would not have occurred but for the negligence of the other person. *Turner v. Roesner*, 193 Ill. App. 3d 482, 490 (1990); see also *Bently v. Saunemin Township*, 83 Ill. 2d 10, 15 (1980) (providing that the negligence of a defendant will not constitute a proximate cause of a plaintiff's injuries if some intervening

act supersedes the defendant' negligence, but if the defendant could reasonably foresee the intervening act, that act will not relieve the defendant of liability). A third party's intervening negligence only breaks the chain of legal causation if it was unforeseeable. *Mack,* 283 Ill. App. 3d *at 57.* "Where an unreasonably dangerous condition is caused by a modification to the product after it leaves the manufacturer's control, the manufacturer is not liable unless the modification was reasonably foreseeable." *Davis v. Pak-Mor Mfg. Co.*, 284 Ill. App. 3d 214, 221 (1996). Here, it was generally foreseeable that trucks would require or undergo routine repairs. The evidence also shows that Paccar's SCH system, if factory installed, would simply have been attached to a radiator and not affixed to the main frame of the truck. As such, Paccar could have foreseen that its SCH system would be subject to removal.

¶ 58                                    3. Rebuilders' Duty

¶ 59        Rebuilders claims error in the circuit court's denial of its motion for judgment notwithstanding the verdict because the special interrogatory was irreconcilable with the general verdict. Within the context of that argument, Rebuilders argues that the circuit court erroneously "opined" that it had a duty to formulate a new and effective safety system to replace the inadequate and missing SCH system with a safer alternative. Rebuilders asserts that the court's holding expanded the scope of its duties beyond its "preventative maintenance" agreement with Recovery. Rebuilders maintains that the circuit court "essentially held that, as a matter of law, a truck mechanic operating pursuant to a limited preventative agreement had a duty to reverse engineer a vehicle designed and manufactured by a multi-billion dollar corporation and invent a better system than that designed and provided by the manufacturer." Rebuilders contends that "[c]ompletely absent from the trial court's analysis is the source of this alleged duty and where this duty was assumed by Rebuilders." We address Rebuilders'

argument in support of judgment notwithstanding the verdict later in this order and focus here on the issue of duty.

¶ 60    Although not entirely clear, Rebuilders appears to rely on established negligence principles, arguing that absent a duty, there is no breach and further, because plaintiff failed to establish proximate cause, it is not the cause of plaintiff's injuries. On the other hand, Rebuilders appears to argue simply that the court's opinion regarding reengineering went beyond the scope of its duties. In either case, its arguments are unavailing. It is worth noting here, however, that we reject out of hand Rebuilders' "reverse engineer" characterization of the circuit court's findings with respect to the scope of its duties.

¶ 61    We first address the issue of duty generally, because clearly, absent a duty, any discussion regarding the scope of that duty is obviated. As in any negligence case, whether Rebuilders owed a duty of care to plaintiff and the nature of the duty owed are questions of law for the court. *Kurtz v. Wright Garage Corp.*, 262 Ill. App. 3d 1103, 1107 (1994). In determining whether a duty exists in a particular negligence case, a court must consider whether a relationship existed between the parties that imposed a legal obligation upon one party for the benefit of the other party. *Id*. The question of duty turns largely on public policy considerations. *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 391 (2004). Traditionally, the issue is informed by these familiar factors: "(1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequence of placing that burden on the defendant." *Id*. Something is foreseeable only if it is objectively reasonable to expect. *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 47 (1991). In the absence of a showing from which the court could infer the existence of a duty, no recovery by

the plaintiff is possible as a matter of law. *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶82; *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991).

¶ 62    Both Rebuilders and Recovery are owned by Sherry Radwanski, operate from the same building, and enjoy a seemingly symbiotic relationship. Recovery provides towing services and Rebuilders provides preventative maintenance on the trucks used by Recovery to perform those services. In fact, on the date of the incident, plaintiff contacted personnel at Recovery who advised him that someone from Rebuilders would come to the scene. Clearly, given the nature of the business and the relationship between the two companies and plaintiff, a relationship existed to impose an obligation of due care. It was the testimony of both DeJesus and Zolner that Rebuilders performed preventative maintenance for Recovery to ensure that Recovery's trucks were safe to be on the roads. Absent consistent and proper maintenance, the trucks would fail and/or cause injury to its users or to others. Such was the case here. Further, the magnitude of the burden on Rebuilders to guard against an injury of the nature suffered in this case is *de minimis*. We believe it was foreseeable to Rebuilders, as the entity contracted with to provide regular maintenance of Truck 55, that the absence of a blowback system on the truck could cause injury to a plaintiff working under the hood of this heavy duty equipment. Thus, we believe that both the duty and breach elements of negligence are satisfied.

¶ 63    Having previously set out the guiding principles regarding proximate cause above, we need not repeat them here. Suffice it to say that, on these facts, both cause in fact and legal cause are satisfied. But for Rebuilders failure to ensure that a blowback mechanism of some kind was on Truck 55, the injury suffered by plaintiff would not have occurred. Further, and without question, it was foreseeable that the kind of injury suffered by plaintiff in this case would occur

if the hood of the truck was not stabilized upon being lifted. Thus, we believe the proximate cause element for negligence is also satisfied.

¶ 64    Turning to Rebuilders' scope argument, we first note that Rebuilders and Recovery do not have a written agreement that can provide guidance as to the scope of the duties. However, Zolner testified that Rebuilders performed preventative maintenance for Recovery, which consisted of "[g]oing over the entire truck, chang[ing] the fluids, greas[ing] it, check[ing] the brakes, mak[ing] sure they're safe to be on the road." DeJesus defined preventative maintenance as follows: "They go through everything. They measure the shoes to make sure the brakes are proper, they check the slack adjustors, they get the front ends up in the air, they check king pins, tie rods, drive shaft, everything." Gratzianna also testified consistently that Rebuilders was responsible as to the Trucks' inspection and repairs. Based on the testimony presented, it appears that scope of Rebuilders' duty was to inspect the trucks for defects and ensure the trucks were safe to be on the road through repairs. Here, the evidence showed that Truck 55 did not have a properly working hood blowback system, thus rendering it unsafe. We find no basis upon which to conclude that the circuit court expanded the scope of Rebuilders' duty. Because Rebuilders breached its duty to repair or replace the hood blowback system, the circuit court did not err in finding that plaintiff's injuries were a result of this breach.

¶ 65                              B. New Trial

¶ 66    Paccar argues that it is entitled to a new trial because (1) the jury verdicts are inconsistent; [5] (2) the verdict is against the manifest weight of the evidence; (3) the circuit court improperly

---

[5] Rebuilders, on the other hand, argues that because Paccar was found liable for an inadequately designed SCH system, Rebuilders' actions could not have contributed to plaintiff's injuries. Given that this argument is similar to Paccar's assertion that the verdicts are inconsistent, we will address it together even though the relief sought by Rebuilders is a judgment notwithstanding the verdict.

instructed the jury; (4) the circuit court erred in refusing Paccar's request for separate verdicts and special interrogatories; and (5) the circuit court improperly admitted expert testimony and evidence of supposedly similar prior incidents.

¶ 67                                  1. Irreconcilable Verdicts

¶ 68        Paccar contends that a new trial is warranted because the jury verdicts are irreconcilable. Paccar asserts that in finding Rebuilders liable, the jury found that the SCH system "was up to the task of providing blowback protection and thus it was more likely than not that it would have prevented the accident." On the other hand, "by [also] finding that the SCH system was so inadequately designed by Paccar that Paccar's conduct was willful and wanton, the jury necessarily accepted the view offered by plaintiff's expert that the SCH system was an 'ineffective and poorly designed device' that would not have prevented the accident." As such, Paccar argues that "[w]hile plaintiff was free to try his case based on alternative, mutually exclusive theories, the jury could not find liability in the alternative. Yet that is precisely what it did."

¶ 69        Rebuilders also argues that the jury's affirmative response to the special interrogatory, finding that Paccar's SCH system was inadequately designed is irreconcilable with the finding that Rebuilders had a duty to maintain that SCH system on the truck. As such, Rebuilders contends that the circuit court erred in denying its motion for judgment not withstanding the verdict.

¶ 70        In addressing a challenge to the consistency of the verdicts, a court will exercise all reasonable presumptions in favor of the verdicts and will not find them legally inconsistent unless they are absolutely irreconcilable. *Redmond v. Socha*, 216 Ill. 2d 622, 643 (2005). Verdicts will not be considered irreconcilable if supported by any reasonable hypothesis. *Id.*

at 644. Whether verdicts are inconsistent is a question of law which we review *de novo*. *Id.* at 642.

¶ 71    Paccar argues that the jury's verdict against Rebuilders means that it found the SCH system to be adequate. We disagree. The issues instruction as to Rebuilders' did not simply require the jury to conclude that Rebuilders acted negligently by removing and failing to reinstall an existing cable and hook system. Rather, the issues instruction (I.P.I. 20.01.01) posits that removal and failure to reinstall the cable and hook system as one of three alternative theories through which the jury could find Rebuilders negligent. The other two alternatives set forth in the issues instructions include "failed in its maintenance of the truck at issue to repair or replace the safety cable and hook" or "permitted the truck to return to service without the safety cable and hook attached." The plain language of I.P.I. 20.01.01 clearly provides that the jury may find Rebuilders negligent on the basis of any three alternatives. No inconsistency exists between the jury's verdict against Rebuilders and its finding that the SCH system was inadequately designed. The jury could have found that the cable and hook was removed, and that Rebuilders failed in performing its maintenance responsibilities by not replacing it with another cable and hook or other safer alternative. As such, Paccar's argument that the "only reasonable interpretation of this instruction is that [Rebuilders] was [solely] being sued for failing to reinstall [an inadequate] SCH system" fails.

¶ 72    Similarly, Rebuilders contends that a jury verdict, finding Paccar's SCH system to be inadequately designed is irreconcilable with the issues that the jury had to assess in finding Rebuilders negligent. Rebuilders argues that the jury, having answered "yes" to the special interrogatory finding Paccar's SCH system to be inadequately designed, was now answering the I.P.I. 20.01.01 as: (1) "Removed the inadequately designed safety cable and hook system

that would not have prevented the hood from unexpectedly closing and failed to reinstall it;" (2) "Failed in its maintenance of the truck at issue to repair or replace the inadequately designed safety cable and hook that would not have prevented the hood from unexpectedly closing;" or (3) "Permitted the truck to return to service without the inadequately designed safety cable and hook that would not have prevented the hood from unexpectedly closing attached." As previously discussed, the instructions provide three alternative theories through which the jury could find negligence. The jury could have both found Paccar liable for inadequate design and Rebuilders liable for failing to repair this defect or replacing it with any other hood blowback prevention alternative. Therefore, we find that the jury verdicts are not irreconcilable.

## 2. Manifest Weight of the Evidence

Paccar contends that even if this court finds that the jury verdicts are reconcilable, the

the verdict is against the manifest weight of the evidence because the evidence supporting the theories is "thin" and "speculative." In support, Paccar reincorporates arguments raised earlier in its brief. As previously discussed, plaintiff asserts two theories against Paccar, one based on negligent manufacture and the other based on negligent design. The first theory provides that Paccar manufactured the truck at issue without an adequate hood safety system to prevent unexpected hood closures. The second theory provides that Paccar designed the truck at issue without an adequate safety system. As we have previously discussed with respect to Paccar's arguments on negligence, there was ample evidence for the jury to have both found Paccar liable for negligently designing the SCH system and also negligent in manufacturing despite the missing SCH system at the time of the accident. Therefore, we find that the verdict was not against the manifest weight of the evidence.

## 3. Jury Instruction

¶ 77      Paccar argues that it is entitled to a new trial because the circuit court erred by refusing to instruct the jury on its proposed instructions. Specifically, Paccar asserts that the circuit court should not have refused its: (1) non-pattern instruction defining the term "adequate" (Paccar Instr. No. 8); (2) Illinois Pattern Jury Instruction (IPI), Civil, No. 400.06, defining "unreasonably dangerous" to mean "unsafe in reasonably foreseeable use." (Paccar Instr. No. 5); and (3) non-pattern instruction that a manufacturer is not liable for injuries caused by modification of a product after it leaves the manufacturer's control (Paccar Instr. No. 6).

¶ 78      As a preliminary matter, we must address whether Paccar has waived any objections regarding its instructions. To preserve an objection to a jury instruction, a party must both specify the defect claimed and tender a correct instruction. *Deal v. Byford*, 127 Ill. 2d 192, 202 (1989). "The objection must be set forth with specificity so that the trial court can be advised of the specific nature of the objection before it makes a ruling." *Bresland v. Ideal Roller & Graphics Co.*, 150 Ill. App. 3d 445, 453 (1986). Here, Paccar concedes that it did not object to the circuit court's pattern instructions on negligence and agrees that the "instructions were appropriate as far as they went." However, Paccar argues that "the jury needed more than the standard negligence instructions to understand Paccar's duties" and therefore, it proposed the non-pattern instruction defining the term "adequate." Paccar contends that this was sufficient as to not waive his argument. Upon examination of the record, we find that Paccar not only set forth its objection by tendering a non-pattern instruction and specifying the defect or limits of the court's general negligence instruction in its post-trial motion, but also explained with a certain degree of specificity as to the defects or limits to the court's instructions during the jury instruction conference. Therefore, Paccar has not waived its arguments with respect to the non-pattern instruction which defined the term "adequate." For the same reasons, Paccar has not

waived its arguments as to IPI 400.06 and its non-pattern instruction regarding liability for product modification.

¶ 79     Our inquiry then turns to whether the circuit court erred in denying Paccar's instructions. Generally, it is within the trial court's considerable discretion to give or deny a jury instruction. *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103 (2003). The use of additional instructions is improper where Illinois Pattern Instructions correctly and adequately charge the jury. *Kent v. Knox Motor Services, Inc.*, 95 Ill. App. 3d 223, 226 (1981). "A trial court is required to use an Illinois Pattern Instruction when it is applicable after giving due consideration to the facts and the prevailing law, unless the court finds that the instruction does not accurately state the law." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273, 266 (2002). "The refusal to give an instruction will result in a new trial only when that refusal amounts to serious prejudice to a party's right to a fair trial." *Smith v. Joy Marvin, M.D.*, 377 Ill. App. 3d 562, 567 (2007). "Even if the plaintiff was prejudiced by the use of [an improper jury instruction], there must be a reasonable basis supporting the conclusion that, but for the error, the verdict might have been different." *Doe v. University of Chicago Medical Center*, 2014 IL App (1st) 121593, ¶ 87.

¶ 80     Here, Paccar does not contend that the negligence instructions were incorrectly given. Rather, Paccar appears to argue that the Illinois Pattern Instructions were inadequate and the instructions it offered were necessary to "explain to the jury what 'adequate' meant" as to the issue of whether the SCH system was adequately designed. The first of the two non-IPI jury instructions that Paccar argued the circuit court improperly refused to give states: "[a] manufacturer does not have a duty to design a product incapable of causing injury or is the safest design possible. Instead, a manufacturer has a duty to design a product so that it is free

of unreasonably dangerous defects." The circuit court also denied Paccar's request to read the related IPI 400.06 instruction which defines "unreasonably dangerous," stating:

¶ 81          "Well, I don't believe in the negligence instruction that the plaintiff's burden of proof is to prove that the negligent design produced an unreasonably dangerous product, are they? *** because it's not a strict liability case, and the committee says I shouldn't. So, this IPI 400.06 will not be given."

¶ 82          Paccar argues that the circuit court incorrectly held that "unreasonably dangerous" only applies to strict liability but not negligence claims. We agree. As previously discussed, the main distinction between a products liability case based on negligence and one based on strict liability lies in the concept of fault. As the condition of the product is at issue in both cases, terms such as "unreasonably dangerous" and "defect" are applicable in both strict liability and negligence claims.

¶ 83          Nevertheless, we find that a new trial is not warranted. The use of additional instructions is only proper where Illinois Pattern Instructions incorrectly and inadequately charge the jury. This is a typical product liability case based on the theory of negligence and the Illinois pattern instructions regarding negligence, which Paccar does not argue are incorrect in any way, was sufficient to instruct the jury on the law in this case. See Ill. S. Ct. R. 239(a) (eff. Jan. 1, 2011) ("Whenever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law."). Even if we were to assume that the pattern instructions were inadequate, we find that the circuit court's refusal to give Paccar's instructions was not prejudicial as to warrant a new trial. Paccar argues that

refusing to give the instructions was prejudicial "in light of the extensive testimony plaintiff presented regarding the claimed superiority of other safety devices." Paccar contends that "the jury may well have believed that [Paccar] had a duty to install the safest possible device on every truck model and could be found not only negligent, but willful and wanton for failing to do so." We first note that the jury was separately instructed on the willful and wanton count and therefore, do not see how the court's denial of additional instructions on the negligence claim would have any bearing on this separate count. We also note that the jury could have found, based on the evidence presented, that the SCH system was simply unsafe or dangerous. As such, the jury could have very well-concluded that Paccar had a duty to make a "reasonably safe" and not the safest device. Thus, the court's refusal to give the instruction did not prejudice Paccar.

¶ 84        Lastly, we find that the circuit court did not err in denying Paccar's instruction concerning liability for modifications. The non-IPI jury instruction that Paccar argued the court improperly refused to give is a non-IPI instruction which states: "a manufacturer may not be held liable for injuries caused by modification made to a product after it leaves the manufacturer's control." This instruction is incomplete as there are circumstances where a manufacturer can be held liable for injuries resulting from a modification to its product after it leaves its control. See *Davis v. Pak-Mor Mfg. Co.*, 284 Ill. App. 3d at 221. Paccar, however, cites to no authority for the proposition that the court should instruct the jury as to the possible circumstances when Paccar would not be liable. As the circuit court notes, these non-IPI instructions would have served to confuse the jury and, were properly excluded. Therefore, we find that the circuit court did not err in refusing Paccar's proposed instructions.

¶ 85                    4. Verdict Forms & Special Interrogatories

¶ 86    Paccar argues that the circuit court erred in refusing its request for separate verdicts and special interrogatories. With respect to separate verdicts, Paccar contends that the jury was not asked to render separate verdicts on plaintiff's negligent design and negligent manufacture theories. Although verdict form "A" consisted of separate line items for the two theories, Paccar asserts that the form did not contain any explanation as to how they differed and therefore, the jury was likely to conclude that the two theories were identical. We find Paccar's argument unpersuasive for two reasons. First, separate verdicts are required only when the claims arise out of different transactions or occurrences. *See Gausselin v. Commonwealth Edison Co.*, 260 Ill. App. 3d 1068, 1077 (1994). Here, separate verdicts would not have been appropriate because the two negligence claims arose from a single transaction or occurrence. Second, the jury was also given a special interrogatory pertaining to the issue of whether Paccar was liable for the negligent design of the hood blowback system to which the jury responded in the affirmative. Had there existed any possibility of confusion as to the jury's finding or any prejudice to Paccar due to the general verdict, the special interrogatory eliminated it.

¶ 87    Next, Paccar argues that the circuit court erred in refusing to give two other special interrogatories. Paccar asserts that one of these interrogatories was aimed at the issue of negligent manufacturing, asking whether "the subject T-800 [was] equipped with a safety cable and hook system to prevent the hood from closing unexpectedly when it left Paccar's control." The other interrogatory went to the issue of design defect, asking whether "the T-800 [was] in a defective and unreasonably dangerous condition at the time i[t] left Paccar's control."

¶ 88    Special interrogatories are designed to be the "guardian of the integrity of a general verdict in a civil jury trial" as they test the "general verdict against the jury's determination as to one or more specific issues of ultimate fact." *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). The

trial court has a duty to instruct the jury to answer a special interrogatory if the interrogatory is in the proper form. *Garcia v. Seneca Nursing Home*, 2011 IL App (1st) 103085, ¶ 49. "A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Id.* Additionally, the interrogatory "should be a single question, stated in terms that are simple, unambiguous, and understandable; it should not be repetitive, confusing, or misleading." *Id.* A trial court's decision on whether to give a special interrogatory is a question of law, which this court reviews *de novo*. *Garcia*, 2011 IL App (1st) 103085, ¶ 35.

¶ 89        Here, the first interrogatory was improper as it can be read to ask two separate questions: (1) whether the T800 was equipped with a safety cable and hook when it left Paccar's control; and (2) whether the SCH would have prevented the hood from closing unexpectedly. Paccar argues that this is not a fair reading of the question as the phrase "to prevent the hood from closing unexpectedly" is simply an explanation of what the SCH system was supposed to do. We disagree. Although Paccar may have intended the additional phrase to simply explain the function of the SCH system, the phrase went to the heart of the dispute in this case as to whether the SCH system was designed or capable of preventing unexpected hood closures. This question would have confused the jury, as they might have found that Truck 55 was equipped with the SCH system when it left Paccar's control but also found that Truck 55 was not equipped with a system that would prevent hood closures. Essentially, the jury would find itself responding to two questions. As such, the circuit court did not err in refusing to give this interrogatory.

¶ 90    As to the second interrogatory, we find that it would be repetitive in light of the special interrogatory given by the court. Here, the circuit court gave the following special interrogatory: "Was the cable and hook blow back safety device for the subject truck inadequately designed by Paccar?" This interrogatory also goes to the issue of negligent design, specifically whether there was a design defect. As such, any error resulting from the circuit court's refusal to give the second interrogatory was remedied by the special interrogatory given by the court. Therefore, the two proposed special interrogatories were properly denied.

¶ 91                              5. Expert Testimony

¶ 92    Both Paccar and Rebuilders argue that they are entitled to a new trial because the circuit court abused its discretion in allowing the testimonies of Dr. Kasbekar and Gratzianna.

¶ 93    We first address Paccar's claims. Paccar contends that the circuit court abused its discretion in allowing Dr. Kasbekar to offer three opinions: (1) that feasible, safer alternative devices existed; (2) that plaintiff would have been injured even if the cable and hook device had been in place; and (3) that the cable and hook could break from the stress of repeated use. Paccar contends that these opinions were irrelevant because it was undisputed that the SCH system was not on Truck 55 at the time of the accident and thus could not have caused plaintiff's injuries. Paccar further argues that, aside from the relevance issue, many of Dr. Kasbekar's opinions should have been excluded because they were too speculative or because he lacked the expertise to give them.

¶ 94    We briefly note that Dr. Kasbekar's opinions regarding safer alternatives and the defective nature of the SCH system goes to the issue of negligent design. The lack of a SCH system at the time of the accident has no bearing on that issue. Having addressed Paccar's argument

- 35 -

concerning the relevancy of Dr. Kasbekar's opinions, our analysis now turns to his qualifications to testify as an expert witness.

¶ 95    The trial court has broad discretion in determining the admissibility of expert opinion testimony, and we review the trial court's decision for an abuse of discretion. *Baley v. Federal Signal Corp.*, 2012 IL App (1st) 093312, ¶ 75. The party seeking to admit the expert testimony "'must demonstrate that the witness is properly qualified as an expert based on his education, training, experience, or a combination of each and that the witness' opinion is not [to be] based on speculation or conjecture.'" *Id.* (quoting *Volpe v. IKO Industries, Ltd.*, 327 Ill. App. 3d 567, 576 (2002)).

¶ 96    As to Dr. Kasbekar, we find that the circuit court did not abuse its discretion in permitting his testimony as it served to aid the jury in deciding the mechanical engineering and material science related issues in the case. At trial, Dr. Kasbekar provided details of his extensive educational and professional background. He testified that he earned his Ph.D. in mechanical engineering and materials science from Duke University, where he had taken courses in "thermodynamics, strength of materials, statics, dynamics, mechanical design," corrosion, and product safety and failure analysis. His work experience includes conducting product defect investigation and failure analysis of power plant components, navy vessels, aircraft carrier propellers, and propulsion systems. Dr. Kasbekar also teaches a course at Duke University every year on failure analysis and prevention. Specifically, he instructs students on how to evaluate loads on devices and its composition. He further instructs on how to identify component failure due to overload or fatigue and how these deficiencies can be addressed. Lastly, he has served on the governing board of the North Carolina Chapter of the Society of Automotive Engineers, a society of engineers working in the automotive, heavy truck, and

heavy equipment manufacturing disciplines. As such, Dr. Kasbekar was qualified as an expert by knowledge, skill, experience, and training to testify about the features of the hood blowback device. Therefore, the circuit court did not abuse its discretion in allowing Dr. Kasbekar to testify.

¶ 97        Next, Dr. Kasbekar offered three opinions that Paccar argues were speculative and improperly admitted: (1) that feasible, safer alternative devices existed; (2) that plaintiff would have been injured even if the cable and hook device had been in place; and (3) that the cable and hook could break from the stress of repeated use. We disagree and find that there was adequate foundational support for each of Dr. Kasbekar's opinions. With respect to alternative devices, the parties concede that Paccar manufactured other alternative devices that were designed to protect against hood closures. The installation of these devices was feasible as Dr. Kasbekar had physically mounted the device on a T800 model truck after identifying secure locations. Dr. Kasbekar opined that these alternatives were safer based on a variety of reasons. For instance, the prop rod system was more visible to the users due to its color and it prevented the hood from moving substantially so there was no risk of getting struck if the hood rotated. Additionally, Dr. Kasbekar opined that the strut system was also another safer alternative as it was clearly visible to the users and utilized an automatic or self-deploy system.

¶ 98        Foundational support also existed for Dr. Kasbekar's opinion that plaintiff would have been injured even if the cable and hook were in place. Although Dr. Kasbekar did not recreate the conditions of the accident, he examined and tested the cable and hook system which revealed that the hood still rotated after the cable and hook engaged. This rotation posed a risk of harm to individuals working under the hood. Lastly, Dr. Kasbekar's opinion that the cable and hook could break from repeated use was also supported based on his examination of prior incident

reports Paccar received regarding situations where the hook had separated from the fiberglass hood. Therefore, Dr. Kasbekar's opinions were properly admitted.

¶ 99          Our inquiry now turns to Rebuilders' claims that the circuit court abused its discretion in allowing Gratzianna to offer opinions against Rebuilders regarding the scope of its contractual duties. Specifically, Rebuilders argues that Gratzianna's testimony impermissibly expanded the scope of Rebuilders' oral agreement to perform preventative maintenance. Rebuilders argues that Gratzianna was not qualified to testify as he was not an engineer, had a degree in applied sciences in a discipline related to being a fireman, and had limited mechanical knowledge of the Kenworth T800 vehicles. Rebuilders contends that "[d]espite this, the [circuit] court allowed him to testify that Rebuilders, which provided mechanic services related to preventative maintenance, had duties beyond those testified to by [Zolner] and [DeJesus], the source of which was and is unknown." Lastly, Rebuilders asserts that no expert testimony was required as the determination of contractual duties falls "within the ken of a juror."

¶ 100          Rebuilders relies on this court's decision in *Baltus v. Weaver Div. of Kidde & Co., Inc.*, 199 Ill. App.3d 821, 837, for the proposition that mere history as a mechanic does not qualify a witness to give opinions. However, Rebuilders' reliance on *Baltus* is misplaced. In *Baltus*, plaintiff was a mechanic who was injured when a transmission slipped off a jack and injured his hand. *Baltus*, 199 Ill. App. 3d at 824. The mechanic sued the manufacturer of the transmission jack on a theory of negligent design, alleging that the manufacturer negligently failed to design the jack with appropriate safety guards and safety devices. *Id.* at 824-25. On appeal, plaintiff argued that he was improperly barred from giving his own testimony as to the manufacturer's negligent design and manufacture of the jack. *Id.* This court found that plaintiff was not qualified to give expert testimony. *Id.* at 837. Although plaintiff's 20 years as an auto-

mechanic who used transmission jacks on a regular basis gave him expertise in their use, the court held that it did not mean he had the knowledge, skills, and experience as a manufacturer or designer of the equipment. *Id.*

¶ 101    *Baltus* is distinguishable from the present case as it addressed expert testimony regarding the manufacture or design of an equipment, which is not the case here. Gratzianna was not called to testify as to the design or manufacture of trucks or the SCH system but rather to offer opinions on tow truck maintenance practices which was within the realm of his expertise, training, experience, and knowledge.

¶ 102    Although Gratzianna worked as a full-time firefighter, he had 25-30 years of experience working in the towing industry. Gratzianna testified to having worked for various tow truck companies, including a family-owned truck service company. He testified that his job responsibilities have included establishing a maintenance program, being familiar with federal regulations governing inspection and maintenance standards, and ensuring compliance by teaching supervisors and mechanics. Although he was not a mechanic, Gratzianna could recognize whether a truck was properly serviced based on this experience and training in the industry. Gratzianna also lectured and had written extensively on subjects related to towing such as towing safety and operations. We find that the circuit court did not abuse its discretion as Gratzianna was qualified, by both training and experience, to offer opinions on tow truck maintenance practices and governing regulations. Additionally, Gratzianna was qualified based on his years of towing industry experience, to explain that it is common practice in the industry for an owner or operator to delegate its maintenance, inspection and repair obligations to a tow truck service company. We also note that Gratzianna offered his opinion that Recovery delegated its maintenance, inspection, and repair obligations to Rebuilders based on his review

of the testimony of employees from Rebuilders and Recovery. As such, we do not find that the circuit court abused its discretion in permitting Gratzianna to testify or that his testimony expanded the scope of Rebuilders' duties.

¶ 103                                6. Similar Prior Incidents

¶ 104        Paccar argues that the circuit court abused its discretion by admitting "highly prejudicial evidence of twelve personal injury claims involving hoods on Kenworth or Peterbilt trucks equipped with the SCH system." Paccar contends that evidence of prior accidents is admissible only if it involves equipment that is substantially in the same condition as that involved in the accident and that the accidents themselves are also substantially similar. Paccar argues that there was no evidence in this case that any of the trucks involved in the other incidents were in substantially similar condition as Truck 55 or involved similar accidents. We disagree.

¶ 105        Evidence of prior occurrences is relevant if it shows (1) the existence of a particular danger or hazard; or (2) the defendant's notice of the hazardous nature of the accident site. *Balough v. Northeast Illinois Regional Commuter R.R. Corp.*, 409 Ill. App. 3d 750, 778 (2011). "If the evidence of the prior accidents is being offered only to show defendant's notice of the generally hazardous nature of the accident site, [plaintiff] does not have to establish a foundation showing the similarity between the prior accidents and the present accident." *Mikus v. Norfolk & Western Ry. Co.,* 312 Ill. App. 3d 11, 23-24 (2000). However, foundation establishing substantial similarity between the prior and present accidents is required if evidence of a prior accident is being offered to prove the existence of a hazard or danger. *Id.* The determination of whether the prior occurrence is substantially similar to the one at issue lies within the sound discretion of the trial court. *Balough v. Northeast Illinois Regional Commuter R.R. Corp.*, 409 Ill. App. 3d 750, 778 (2011).

¶ 106    Here, evidence of the prior incidents was admitted to show that Paccar had notice of the hazardous nature of the SCH system. As such, plaintiff does not need to establish foundation showing the similarity between the prior and present accident. To the extent that the prior incidents were also admitted to show the existence of danger or hazard associated with the SCH system, we find that foundation was properly established. In arguing against this conclusion, Paccar asserts that the trucks involved in the other incidents were not "substantially [in] the same condition" as they did not lack a SCH system and therefore, foundation was not established. However, the common condition between the prior incidents and plaintiff's accident is the lack of a properly designed hood blowback system. The condition need not be identical. See *Balough*, 409 Ill. App. 3d at 779 (providing that "the prior occurrences need only be substantially similar to the accident in question; they need not be identical."). Therefore, we find that the circuit court did not abuse its discretion in admitting evidence of prior incidents.

¶ 107                              7. Illinois State Police Inspections

¶ 108    Rebuilders argues that the circuit court erred in granting plaintiff's motion *in limine* to exclude portions of DeJesus' testimony regarding truck inspections performed by the Illinois State Police. Rebuilders asserts that the circuit court incorrectly held that the testimony lacked foundation and was hearsay because: (1) DeJesus's testimony about the inspections performed by the State Police and the scope of the inspections was based on his personal knowledge; (2) the testimony was not offered to prove the truth of the matter asserted but to "show the effect on DeJesus's mind and reasons for his subsequent actions;" and (3) the testimony should be admissible under the doctrine of completeness or "fairness."

¶ 109    Generally, a trial court's decision on a motion *in limine* will not be disturbed absent an abuse of discretion. *Hallowell v. University of Chicago Hospital*, 334 Ill. App. 3d 206, 210

- 41 -

(2002). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003). Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and, in the absence of an exception, is generally inadmissible. *Piser v. State Farm Mutual Auto. Ins. Co.*, 405 Ill. App. 3d 341, 351 (2010). The doctrine of completeness is one such exception to the hearsay rule.  Illinois R. Evidence 106 (eff.  Jan. 1, 2011); *People v. Boand*, 362 Ill. App. 3d 106, 132 (2005). The doctrine permits a "party to introduce the remainder of a conversation or writing in order to explain, qualify, or otherwise shed light on that portion of a statement introduced by an opponent." *In re W.D.*, 194 Ill. App. 3d 686, 702-03 (1990). "Under the common law completeness doctrine, the remainder of a writing, recording or oral statement is admissible to prevent the jury from being [misled], to place the admitted evidence in context to convey its true meaning or to shed light on the meaning of admitted evidence." *People v. Kraybill*, 2014 Ill. App. (1ˢᵗ) 120232, ¶ 67.  The doctrine is not available merely for the purpose of contradicting a defendant's earlier admitted statements. See e.g., *Kraybill* at ¶ 67.

¶ 110    Here, the circuit court barred DeJesus's testimony that the Illinois State Police periodically inspected Recovery's trucks, that "everything [was always] perfect," and he would always "come out like a champ." Rebuilders argues that DeJesus's testimony was not hearsay as it was not being offered for the truth of the matter asserted. Rather, it was offered to show that there was no reason why Truck 55 would be part of Rebuilders "assigned or expected maintenance duties" when it passed all safety inspections. We disagree. The testimony goes to the truth of the supposed results of the inspections and therefore, is hearsay. Additionally, we find that the circuit court correctly held that the testimony lacked foundation because Rebuilders did not identify any witnesses from the Illinois State Police nor did it present any

inspection records. Further, even if we could find that the doctrine of completeness applied, and we do not, the proffered evidence appears to have been offered for the sole purpose of contradicting plaintiff's evidence on the subject of maintenance. Thus, we find that Rebuilders' argument that the testimony should have been admitted under the doctrine of completeness or "fairness" unavailing.

¶ 111                                                    C. Damages

¶ 112                                          1. Compensatory Damages

¶ 113      Defendants argue that the circuit court's denial of their request for remittitur of the $10 million compensatory damages award was an abuse of discretion. Defendants contend that the award was excessive and that the sheer amount of the award demonstrates that the jurors were moved by "passion and prejudice."[6] Defendants assert that this passion and prejudice was due to the jurors being instructed as to the willful and wanton count against Paccar during deliberation on the award for compensatory damages and not being informed that it would later have the opportunity to deliberate on punitive damages if it found Paccar liable. Additionally, defendants do not dispute whether "the elements of damages sought in this matter" were met but instead assert that the "award for those damages were not the product of a proper analysis" and went beyond "fair and reasonable compensation."

¶ 114      A court's inherent power to order a remittitur for excessive damages has been long recognized. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 411-12 (1997). However, a remittitur is proper only when the damages award (1) "falls outside the range of fair and reasonable compensation," (2) "appears to be the result of passion or prejudice," or (3) "is so large that it shocks the judicial conscience." *Klingelhoets v. Charlton-Perrin*, 2013 IL App

_____

[6] Paccar adopts the same arguments as Rebuilders on this issue.

(1st) 112412, ¶ 67. "Where [a] jury's damages award falls within the flexible range of conclusions reasonably supported by evidence, remittitur should not be granted." *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 80. We review the trial court's decision to grant a remittitur for an abuse of discretion. *Id.*

¶ 115      Defendants point out that the award for "future pain and suffering" and "future disability damages" was improper as it was double the amount of "past pain and suffering" and "past disability" even though plaintiff has a better paying job and there is no evidence that plaintiff would require further surgery. Generally, future damages by their very nature are subject to some uncertainties. As such, "it [is] impossible to establish a precise formula to determine whether a particular award is excessive or not." *Snelson v. Kamm*, 204 Ill. 2d 1, 37 (2003). However, some factors that can be considered in determining whether the award is excessive include the extent of the injuries suffered, the permanency of plaintiff's condition, plaintiff's age, the possibility of future deterioration, the extent of plaintiff's medical expenses, and the restrictions imposed on plaintiff by the injuries. *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 67.

¶ 116      Here, plaintiff was 26 years old at the time of the accident and had a future life expectancy of 47 years at the time of trial. In denying defendants' request for remittitur, the circuit court noted that "[g]oing forward, he will have disfigurement from his severely fractured facial bones and the loss of his eye. He has a sunken face on the right side with plates permanently inserted, which cause him pain when the weather is cold." The circuit court also noted that plaintiff "will suffer emotionally throughout the rest of his life, both from the effects of his disability and from the fear he says he experiences over the possibility of injury to his other eye and resulting total blindness." Additionally, while there appears to be no expert testimony as to the express costs of plaintiff's future medical expenses, no such testimony is necessary.

See *Rainey v. City of Salem*, 209 Ill. App. 3d 898, 907 (1991). Based on the evidence, we cannot say that the circuit court abused its discretion in denying remittitur.

¶ 117                                                    2. Punitive Damages

¶ 118       Paccar contends that regardless of this court's decision on the compensatory damages, the $10 million punitive damages award against it should be vacated and the judgment entered in its favor on the willful and wanton count. Paccar argues that plaintiff could not show that the "conduct of equipping Paccar's T800 vehicles with a supposedly defective SCH system" was willful and wanton and caused plaintiff's injuries. Paccar also contends that it did not deliberately subject the operators of its T800 vehicles to a known risk of serious injury but rather, Paccar was the first truck manufacturer to install the hood blowback safety devices on its trucks even though no federal or industry standard required it to do so.

¶ 119       "Punitive, or exemplary, damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990). Due to their penal nature, "courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 188 (1978). Punitive damages may be awarded "when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Barton v. Chicago and North Western Transp. Co.*, 325 Ill. App. 3d 1005, 1030 (2001) (citing *Kelsay*, 74 Ill. 2d 172, 186 (1978)). "[C]onduct characterized as willful and wanton may be proven where the acts have been less than intentional – i.e. where there has been a failure after knowledge of impending danger, to exercise ordinary care to prevent the danger." *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 274

(1994). In the context of a punitive damages award, wilful and wanton conduct approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it. *Homewood Fishing Club v. Archer Daniels Midland Co.*, 239 Ill. App. 3d 102, 115 (1992).

¶ 120     There is no separate and independent tort of willful and wanton conduct. *Jane Doe-3 v. McLean County Unit Dist. No. 5 Board of Directors*, 2012 IL 112479, ¶ 19. Such conduct is viewed as an aggravated form of negligence. *Id*. Thus to recover damages based on defendant's alleged negligence involving willful and wanton conduct, the plaintiff must allege and prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injury. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 235 (2010). See also *Calles*, 224 Ill. 2d at 270 (providing that plaintiff must establish that the injury was proximately caused by defendant's breach of duty). Additionally, a plaintiff must allege either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare. *Id.*

¶ 121     To establish proximate cause, a party must first show that the defendant's negligence was the actual cause of the injury. *Yoder v. Ferguson*, 381 Ill. App 3d 353, 372 (2008); *Bourgonje v. Machev*, 362 Ill. App 3d 984, 1007 (2005). As we set forth earlier in our discussion, proximate cause consists of legal cause and cause in fact. *Lee*, 152 Ill. 2d at 455. Cause in fact, or actual cause, exists if, "but for" the defendant's conduct, the injury would not have occurred. *Turner v. Roesner*, 193 Ill. App. 3d 482, 490 (1990). The relevant inquiry is whether the defendant's conduct is a material element and a substantial factor in bringing about the injury. *Id*. Conduct is material and a substantial factor in bringing about an injury if, absent that conduct the injury would not have occurred. *Id*.

¶ 122    "Whether punitive damages can be awarded for a particular cause of action is a matter of law, but the question of whether a defendant's conduct was sufficiently willful and wanton to justify imposing punitive damages is generally for the jury to decide." *Barton*, 325 Ill. App. 3d at 1031. We review the jury's finding of willful and wanton conduct on a manifest weight of the evidence standard. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1139 (2004). A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 118.

¶ 123    Although we can agree that the defective design of the SCH system made it subject to removal, and once removed, not replaced, we cannot overlook the undisputed fact that that particular mechanism, no matter how flawed, was not on Truck 55 at the time of the accident. It is not clear from the evidence by whom or when the SCH system might have been removed. What is clear, however, is that at the time of accident, the radiator and hood were not the manufacturer's original parts. Also clear is that Rebuilders, the entity that provided preventative maintenance on the truck, apparently took no steps to provide any safety device at all. Regardless of how poorly designed, it was not Paccar's manufactured device that actually failed at the time of the incident; in fact, it was no one's device, and therein lies the problem. With respect to the condition of Truck 55 at the time of the incident, there is no evidence that Paccar deliberately intended to harm or that it consciously disregarded the welfare of plaintiff.

¶ 124    The evidence that plaintiff claims established willful and wanton conduct, and on which the trial court relied in upholding the punitive damages award, was the fact that the SCH system did not effectively protect against hood blowback, despite Paccar being on notice of several instances of the system's failure over the years. However, given that the defectively designed

SCH system was not on the Truck at the time of the accident, there is no connection between Paccar's alleged willful and wanton conduct and plaintiff's injury. Thus, it cannot be said that Paccar's conduct was a material and substantial factor in bringing about plaintiff's injuries.

¶ 125    Although we find evidence sufficient to support proximate cause for negligent design, given the absence of the SCH system from Truck 55 and Rebuilders negligence in failing to ensure or equip the modified truck with any device at all, we believe that the jury's finding of willful and wanton conduct against Paccar, on these particular facts, is against the manifest weight of the evidence. Accordingly, we vacate the $10 million punitive damages award against Paccar.

¶ 126                                III. CONCLUSION

¶ 127    For the reasons stated, we affirm the judgment of the circuit court of Cook County but vacate the award of $10 million in punitive damages.

¶ 128    Affirmed in part and vacated in part.